Richard DAVIS

v.

SHERATON SOCIETY HILL HOTEL.

Civ. A. No. 94–5944.

United States District Court,
E.D. Pennsylvania.

Dec. 18, 1995.

Lanier E. Williams, Philadelphia, PA, for plaintiff.

Regina C. Reardon, Bray & Reardon, P.C., Blue Bell, PA, for defendant.

## MEMORANDUM

JOYNER, District Judge.

Defendant, Sheraton Society Hill Hotel, seeks a summary judgment on the Complaint against it filed by Plaintiff, Richard Davis. This case is a reverse sex discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–17 (1994), as well as the Pennsylvania Human Relations Act, 43 Pa.Stat.Ann. §§ 951–963 (1991) (PHRA).

■ This Court will grant a summary judgment in the event that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and that the moving party is enti-

tled to judgment as a matter of law. Fed. R.Civ.P. 56(c). We will determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In making this determination, we will view the facts in the light most favorable to the non-moving party and make all reasonable inferences in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2514. Once the movant has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

■ In Title VII sex discrimination cases,[1] the Supreme Court has delineated a three-part, burden of production-shifting analysis. The standard we apply to this litigation is slightly different from the typical analysis because this action asserts reverse discrimination, i.e., discrimination against Davis due to his being male.[2] Therefore, to make a prima facie case of reverse sex discrimination, he must show:

1) background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority;

2) he was qualified for his position;

3) despite these qualifications, he was terminated from his position; and

4) he was replaced by someone not in his class, or that someone in another class,

---

1. The PHRA is applied to accord with Title VII. For this reason, our discussion under Title VII applies equally to the PHRA claim.

2. Plaintiff cites *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 276, 96 S.Ct. 2574, 2576, 49 L.Ed.2d 493 (1976), for the proposition that "conceptually, there is no sound reason" why a "heightened or more exacting standard" should be applied when plaintiff is a man, as opposed to a woman. *McDonald* does not support this statement, however. Rather, it provides

the now-evident idea that Title VII protects all individuals equally. *Id.* The reason for the different standard applied here is that "conceptually," there is no reason to presume discrimination against historically favored litigants in the event of adverse job occurrences. *Livingston v. Roadway Express, Inc.,* 802 F.2d 1250, 1253 (10th Cir.1986); *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985); *McMahon v. Impact Sys., Inc.,* No. 91–6060, 1992 WL 201004 at *2–*3 (E.D.Pa. Aug. 11, 1992).

**900**

otherwise similarly situated, was treated more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 & n. 13, 93 S.Ct. 1817, 1824 & n. 13, 36 L.Ed.2d 668 (1973); *Livingston v. Roadway Express, Inc.*, 802 F.2d 1250, 1252 (10th Cir.1986). The prima facie case is not intended to be rigidly applied or difficult to show. *Metal Serv.*, 892 F.2d at 347.

■ Once a prima facie case is made, the burden of production switches to Sheraton to assert legitimate, non-discriminatory reasons for the allegedly discriminatory actions. *Id.* If Sheraton can make that showing, the burden of production switches back to Davis to rebut Sheraton's proffered legitimate reasons by a preponderance of the evidence. *Id.* This can be done either by showing that each reason is a recent fabrication or that discrimination is more likely than not a motivating or determining cause of the actions. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637–38 (3d Cir.1993).

■ At the summary judgment stage, a plaintiff can produce evidence that either makes us disbelieve the defendant's proffered reasons or show such implausibilities and inconsistencies that the employer's proffered reasons become unbelievable. A plaintiff "need not prove at th[e summary judgment] stage that the employer's purported reason for its actions was false, but the plaintiff must criticize it effectively enough so as to raise a doubt as to whether it was the true reason for the action." *Solt v. Alpo Petfoods, Inc.*, 837 F.Supp. 681, 684 (E.D.Pa.1993) (citing *Naas v. Westinghouse Elec. Corp.*, 818 F.Supp. 874, 877 (W.D.Pa.1993)). However, "an ill-informed decision or an ill-considered decision is not automatically pretextual if the employer gave an honest explanation for termination." *Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir.1991).

The Third Circuit has held that "factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." *Josey,* 996 F.2d at 638–39 (defendant cited economic considerations to explain Afri-

can American plaintiff's termination but replaced plaintiff with Caucasian employee at higher wage).

**FACTS**

The following statement of facts is not wholly uncontested. On a motion for summary judgment, however, we take the nonmovant's facts as true and so it is Davis's version that follows. Richard Davis was hired by Sheraton in March, 1990 as an On Call Banquet Waiter. In February, 1993, Davis's female manager, Jolette Kellyman, encouraged him to apply for the position of Guest Service Agent (GSA). He was awarded that position and satisfactorily completed his training. In June, 1993, Davis received additional training to become a Night GSA. This position permitted him to work the Graveyard shift on a four days on/three days off schedule. This was a desirable shift because of the three days off. In July, 1993, Davis received an overall "good" rating on his first formal evaluation as a GSA.

In mid-September, 1993, Davis went on a scheduled week-long vacation to Mexico. On the last day of his trip, Davis slipped on some stairs and injured his back. When he returned, his doctor ordered him to take two weeks off for bed rest and then limited him to light duty work for another two weeks. During the time that Davis was on vacation, on bed rest and doing light duty work in Sheraton's telephone reception office, his Night GSA duties were covered by a female co-worker, Lori Murray.

When Davis returned to Sheraton for light-duty work on October 5, 1993, Murray told Davis that she had bargained for his job and that Kellyman had given her the Night GSA position permanently. Davis questioned Kellyman about Murray's statement. Kellyman denied it, but told Davis that she was not sure that he would be returned to the Night GSA position. About two weeks later, Kellyman again told Davis that she had reservations about returning him to the Graveyard shift because of problems she believed he had performing the job.

On October 25, 1993, Davis's doctor released him to full duty. Kellyman told Davis that because he had not worked as Night

GSA for so long he would have to be re-trained, which could not be scheduled until late November or early December. According to Sheraton, its policy is to require retraining in the event of substandard performance or extended absence from the job. Kellyman told Davis that he would have to continue on telephone duty until he was retrained.

Davis ultimately resigned on November 2, 1993. On that day, he and several other employees had gathered together to talk and laugh. One of the employees was a man performing his duties in the wrong place. Kellyman called Davis into her office and told him that she could hear him above all the others, that his conduct was unprofessional and that he should stop. In addition, she instructed him to tell his male co-worker to return to his station. Davis left her office, returned to his station and communicated her message to his co-worker, who did not leave. A few minutes later, a female co-worker tried to engage Davis in conversation. He told her that he could not talk to her because Kellyman would single him out again and discipline him. He also stated that he was tired of Kellyman's treatment of him and had called an attorney about it that very morning.

Kellyman overheard this and called Davis into her office again. She told him that he had acted with immaturity and that if he did not like the way she did things, he could leave. He accepted her offer and went to Sheraton's Human Resources Department. He wrote a resignation letter that stated that Kellyman had sexually discriminated against him. He also told Jennifer Harris, the Assistant Director of Human Resources, that he had been sexually discriminated against and harassed. Furthermore, he asked Harris if he could resign but continue his work as an On Call Banquet Waiter. Harris told him that if he resigned, he could not work for Sheraton at all. She also told him that she did not think that Kellyman would have discriminated against him.

After he resigned, Davis filed for unemployment compensation benefits. The Unemployment Compensation Board of Review found that he had been sexually harassed and had resigned due to compelling and necessitous reasons.

In addition to the incident that resulted in his resignation, (referred to in this memorandum as the "singling-out incident") Davis has provided additional evidence concerning a number of other allegedly sexually discriminatory and harassing incidents. The one described in his complaint, the "red bag incident," occurred shortly after Davis returned to light duty work. Normally, Davis carried a black shoulder bag to work. Kellyman suggested that the bag might be aggravating his shoulder and suggested that he carry a different type of bag. The next day, he came to work with a red satchel. While he was in a group with four female co-workers, Kellyman teased him by saying "I like your red bag. I have a pair of red pumps that would look nice with that, and I have a red dress that could match the bag and the pumps." She also said, "I thought only women brought bags like that to work." His female co-workers joined in and called Davis "Rochelle." Davis responded, "My name is Rick and I would appreciate it if you didn't call me that." When Sheraton's concierge entered the room, Kellyman asked him, "How do you like Rick's bag?" When the Concierge did not respond, everyone returned to work. However, for the next week, Davis's female co-workers continued to call him Rochelle. Davis asked Kellyman to tell them to stop, but she told him to tell them himself.

Davis presents other alleged instances of discrimination, not mentioned in his complaint, for the purpose of showing background circumstances of discrimination against men. For example, Kellyman allegedly told Davis that she did not believe that men should wear earrings, as he did. Also, he contends that Kellyman refused to give him a suitable recommendation when he applied for a Night Security Guard position that had the same hours as the Night GSA position. Although Kellyman checked the "recommend" box on the application form, the only comment she wrote was "Rick feels he is ready for a change." Davis contends that this was an inappropriate recommendation, made on the basis of his sex. In addition, Davis claims that he was discriminated

against when he had to wait several months longer for a raise than a female co-worker who started as a GSA at the same time as him. He did eventually receive the raise as well as a lump sum to account for the missing months. Sheraton has not explained the reason for the delay in Davis's pay increase. Further, Davis alleges discrimination in that an unnamed female Administrative Assistant received a tuition reimbursement in 1993, but that his request for tuition reimbursement was denied. Finally, Davis points to the alleged fact that Sheraton did not follow its own sex discrimination policy with respect to him because it never investigated his allegations of discrimination, even when formally informed of his complaints in his resignation letter.

## DISCUSSION

### I. Sex Discrimination under Title VII and the PHRA

#### A. PRIMA FACIE CASE

##### 1. Member of a Protected Class

■ Davis asserts that Sheraton is that unusual employer that discriminates against the majority. *McMahon,* 1992 WL 201004 at *3. His evidence as to background circumstances that make this proposition believable are found in his affidavit, deposition and the transcript of the unemployment compensation appeal, all of which are in evidence before us.

To several courts, sufficient background circumstances of reverse discrimination have not been shown when the number of male employees significantly outweighs the number of female employees. *Jones v. Slater Steels Corp.,* 660 F.Supp. 1570, 1576 (N.D.Ind.1987) (345 men and 2 women); *Livingston,* 802 F.2d 1250 (189 men and 2 women); *see also Murray,* 770 F.2d 63 (majority of employees were white). Other courts question whether the plaintiff has shown differential treatment of women and men. *McMahon,* 1992 WL 201004 at *4.

Sheraton's defense has two prongs. First, it presents evidence to controvert Davis's evidence. It shows that no Administrative Assistant received a tuition reimbursement in 1993, meaning that no woman was treated better than Davis. Also, it contends that because Davis did receive his pay increase, albeit retroactively, he received the same benefits as his female co-worker. Sheraton's conflicting·evidence, however, merely serves to create material issues of fact.

■ Second, Sheraton maintains that Davis's evidence, even if true, does not actually show discrimination against him on the basis of his sex, but rather, discrimination against him based on his gender. According to Sheraton, the red bag incident and earring comments do not refer to Davis's sex, but to his gender, and discrimination based on gender is not protected under Title VII. *Dobre v. Amtrak,* 850 F.Supp. 284, 286 (E.D.Pa. 1993). In *Dobre,* our Court dismissed plaintiff's case when plaintiff, a transsexual, alleged that her employer discriminated against her because she was a man who wanted to be a woman, not because she was a woman or a man. We held that this was discrimination based on gender, or sexual identity, and that Title VII did not prohibit that. *Id.* Likewise, Sheraton argues, Kellyman and the others challenged Davis's sexual identity only, not his sex, when they compared him to a woman and his accessories to female-identified accessories. For this reason, Sheraton argues, we cannot use these incidents to support a claim of sex discrimination.

We agree that Davis has not shown that those two incidents involved discrimination or harassment of him based on his sex as opposed to his sexual identity. For this reason, we will not consider them for that purpose. Nonetheless, we find that Davis's other evidence, taken as true for this motion, shows sufficient background circumstances that raise the suspicion that Sheraton is the unusual employer that discriminates against men. For this conclusion, we largely rely on the delayed pay increase and the alleged tuition reimbursement discrepancy. In addition, is Davis's evidence that there were several more female GSA employees than male and that all of the GSA supervisors were women. Accordingly, for the purposes of this motion, this element is met.

### 2. Qualified for Position

■ Sheraton relies heavily on this element to support its motion for summary judgment. Its arguments on this point also support its contention that it had legitimate reasons for its actions. It presents evidence that Davis was not qualified to be returned to the Night GSA position because he needed to be retrained. It presents affidavits that Sheraton employees are always required to be retrained if they demonstrate substandard performance or have not worked the position for an extended period of time. In response to Davis's challenge to flesh out this generic statement with evidence, it presented an affidavit stating that both men and women are required to undergo retraining. As an example, it provided the names of nine women, all in the Housekeeping department, who were retrained. Significant by their absence, however, are the many other pieces of information that would make this affidavit relevant. For example, Sheraton does not inform the court whether those women were retrained for substandard performance or extended absence. Nor does it ever define the term it considers "extensive," not even with respect to those nine women. All it provides is their names, department and sex. If their retraining was due to absence, it does not provide any evidence concerning the length of time each was absent, when their retraining occurred, whether the policies in the Housekeeping Department were the same as those in Davis's department, or any other relevant information.

Davis's evidence is that he was qualified for the Night GSA position, as demonstrated by the good evaluations he had received in both oral and written form. In addition, he argues that the mere five to six weeks he was absent from the Night GSA position does not constitute an extended absence such that re-training is necessary, nor that it was impossible for him to receive on-the-job retraining if necessary.

We find that there is very little real evidence on this point. Sheraton's evidence is almost non-existent due to its lack of specificity whereas Davis's evidence largely consists of affirmative assertions that he was prepared for the position. Accepting his evidence as true for the purposes of this motion, however, we find that Davis has presented sufficient evidence to support a finding that he was qualified for the position.

### 3. Despite Qualifications, Plaintiff Suffered an Adverse Employment Decision

■ Sheraton asserts that Davis was not terminated or demoted, but that in fact, Davis resigned. For this reason, Sheraton contends that Davis cannot make the prima facie case. Davis, however, contends that he was forced to resign due to intolerable conditions of employment. A constructive discharge would fulfill this element.

■ A Title VII plaintiff can show constructive discharge by showing that "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir.1992). So, for example, a constructive discharge was found when the employer unilaterally lowered plaintiff's salary on the grounds that she was a woman and pregnant. *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir.1984). Likewise, a manager-plaintiff was constructively discharged when she was denied admission to management meetings, denied purchasing authority, her employer would not speak with her, merchandise was planted in her company locker to set her up on theft charges and rumors were spread that she would be replaced by a man. *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227, 1231 (3d Cir. 1988). In contrast, constructive discharge is frequently not found when an employee's job duties are changed, even when the employee is demoted, but when the employee's salary and benefits remain the same. *Gray*, 957 F.2d at 1083; *Jett v. Dallas Indep. School Dist.*, 798 F.2d 748, 755 (5th Cir.1988). Nor is constructive discharge generally found when an employer simply scrutinizes the employee's work "overzealously." *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1162 (3d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993); *Stewart v.*

*Weis Markets, Inc.*, 890 F.Supp. 382, 394 (M.D.Pa.1995).

■ We find that Davis has not presented this Court with facts sufficient to demonstrate that he was constructively discharged. His facts are that he faced discrimination throughout his employment, culminating in the singling-out incident. No reasonable jury could find that isolated comments with respect to his earring or choice of bag, even when combined with conduct like a delayed raise, could create a situation "so difficult or so unpleasant that he had no choice but to resign." *Jett,* 798 F.2d at 755 ("loss of . . . responsibilities not so intolerable that a reasonable person would have felt compelled to resign").

Despite this, we find that Davis has still shown sufficient adverse employment action so as to survive summary judgment. Taking Davis's facts as true and viewing them in the light most favorable to him, we find that Kellyman's refusal to replace Davis in the Night GSA position is an adverse employment action under Title VII. Title VII precludes sex discrimination against "any individual with respect to his compensation, terms, conditions, or privileges of employment." This has been held to preclude job reassignments motivated by sex considerations. *Day v. Derwinski,* 771 F.Supp. 588 (S.D.N.Y.), *aff'd,* 953 F.2d 635 (1991). In this case, we find that if Davis's facts are true, a jury could find that the refusal to reappoint him to Night GSA qualifies as discrimination with respect to the terms, conditions or privileges of his employment.

### 4. Was Replaced by Member of Non–Protected Class

■ For the purposes of this motion, we accept that Davis was temporarily replaced by Murray, a woman. There is no evidence as to Davis's permanent replacement. Therefore, this element is met for the purposes of this motion. With this final element, Davis has successfully made out a prima facie case of reverse sex discrimination. The burden now shifts to Sheraton.

### B. LEGITIMATE NON–DISCRIMINATORY REASONS

Sheraton contends that it had a legitimate, non-discriminatory reason for its refusal to replace Davis in the Night GSA position. This reason is that he needed retraining before he could be permitted to resume the Night GSA duties. If true, this could be a legitimate reason for not replacing Davis in the Night GSA position. Given this showing, the burden now returns to Davis to show that the reason is pretextual.

### C. PRETEXT

■ Davis's pretext evidence is that he did not need retraining for the position. He presents evidence that he had successfully completed Night GSA training within several months of these events, that he had received good evaluations in that position and that he was not absent from the position for an extended period of time. These facts, in combination with the background circumstances of sex discrimination, allegedly show pretext.

Sheraton responds that Davis's subjective belief that he was qualified for the position without retraining is legally irrelevant. *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Furthermore, Sheraton challenges whether Davis's evidence demonstrates "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994) (*citing Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 531 (3d Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993)).

On a motion for summary judgment, a plaintiff may rely on his prima facie case to discredit the defendant's proffered reasons. *Waldron v. SL Indus.,* 56 F.3d 491, 494–95 (3d Cir.1995). For the reasons given above, we find that there is a material issue of fact as to whether Davis needed to be retrained before re-assuming the Night GSA position in October. Therefore, for the purposes of

this motion, we accept his facts as true and find that Davis has adequately demonstrated that a jury could rule that the retraining requirement was a pretext for discriminating against him on the basis of his sex. For this reason, we deny summary judgment on Count One.

## II. Sex Harassment under Title VII and the PHRA

■ In 1986, the Supreme Court recognized "hostile environment" sexual harassment as a violation of Title VII. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). It held that a plaintiff can show a Title VII violation by showing that "discrimination based on sex has created a hostile or abusive work environment." *Id.* A plaintiff can show such an environment with evidence that (1) the employee suffered intentional discrimination because of his sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position and (5) there is respondeat superior liability. *Spain v. Gallegos,* 26 F.3d 439, 447 (3d Cir.1994). We shall address each element in turn.

### 1. Intentional Discrimination Based on Sex

■ Sheraton makes the same arguments as above why Davis cannot show discrimination based on his sex. It maintains that, at most, the red bag incident is discrimination based on gender. It also argues that the singling-out episode does not show discrimination based on sex because an unreprimanded man was also in the group.

Davis asserts that he has shown discrimination based on sex when those incidents are viewed in the light of the background circumstances of discrimination. Given this background, we find that there is at least an issue of fact as to whether Davis was discriminated against on the basis of his sex.

### 2. Discrimination was Pervasive and Regular

■ Sheraton contests this element on the ground that only two incidents of dis-

crimination are alleged in Davis's complaint, the red bag incident and the singling-out incident. Two occurrences, it argues, do not rise to the level of pervasive and regular discrimination.

Davis argues, in contrast, that his female co-workers called him Rochelle for a week before he convinced them to stop. According to Davis, when this is combined with the background circumstances, an environment pervaded by discrimination against men is seen. We, however, do not see such an environment. Plaintiff has provided this Court with evidence of several discreet incidents, none of which are related to each other. Even if we accepted the Rochelle comments as sex-based discrimination, one week of allegedly offensive comments does not rise to the level of a hostile environment workplace. In *Harris v. Forklift Sys., Inc.,* — U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court held that whether an environment is hostile can only be determined by "looking at all the circumstances." *Id.* at ——, 114 S.Ct. at 371. It instructed courts to look at "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or *a mere offensive utterance." Id.* (emphasis added). We find that given the totality of the circumstances, Davis has not presented evidence that raises a question of fact as to the pervasiveness or regularity of the discrimination he allegedly suffered.

### 3. Detrimental Effect

Sheraton concedes that whether Davis was detrimentally affected and whether a reasonable man in his position would be detrimentally affected are questions of fact for the jury.

### 4. Respondeat Superior Liability

■ Sheraton contends that Davis has not shown that it is liable for any discrimination inflicted by Kellyman. Rather, it points to its sexual harassment policy, of which Davis concedes he was aware. Further, it argues that Davis only notified it of Kellyman's alleged harassment when he resigned

so that it cannot be liable for any discrimination that took place until it received that notice.

Davis argues, though, that Kellyman, a supervisory agent of Sheraton, was aware of the discrimination. Furthermore, he argues that when he informed Harris of the discrimination she simply denied that Kellyman would have done those things and did not follow Sheraton's sexual harassment policy.

We find that there is a disputed issue of fact as to whether Sheraton had notice of Kellyman's alleged sexual harassment of Davis. It is possible that Sheraton should have been put on notice of problems in the GSA department when Davis was denied tuition reimbursement and when his raise was delayed for several months. Regardless of this finding, however, we still rule that summary judgment is appropriately granted on this claim due to our finding on the pervasive and regular prong. For this reason, Count Two shall be dismissed.

An appropriate Order follows.

### ORDER

AND NOW, this 18th day of December, 1995, upon consideration of Defendant's Motion for Summary Judgment and responses thereto, the Motion is hereby GRANTED in PART and DENIED in PART. The Motion is hereby GRANTED to the extent that summary judgment is hereby ENTERED in Defendant's favor on Count Two of Plaintiff's Complaint. The Motion is hereby DENIED with respect to Count One.