issues as collaterally estopping Hoover in this insurance contract dispute.

## VI. Conclusion:

For all of the reasons stated above I find that, CU has the duty to defend Hoover in this case. Regardless of which state's law is applied the contract language is clear, the complaints filed trigger the duty to defend under the policy. The finding by a jury in *Pulte* that Hoover fraudulently induced the purchase of FRT plywood is not a bar to Hoover's claim for defense for its insurance matters. Hoover's motion for summary judgment is granted and CU is obligated to defend and to pay unpaid defense obligations. Counsel for Hoover shall submit an appropriate order under the five day rule.

712 A.2d 725

SAMUEL DECAPUA, PLAINTIFF, v. BELL ATLANTIC—
NEW JERSEY, INC., DEFENDANT.

Superior Court of New Jersey
Law Division
Essex County

Decided January 21, 1998.

*Keith A. McKenna,* for plaintiff (*Ambrosio, Kyreakakis, DiLorenzo, Moraff & McKenna,* attorneys; *Mr. McKenna,* on the brief).

*James P. Lidon,* for defendant (*Carpenter, Bennett & Morrissey,* attorneys; *Francis X. Dee,* of counsel; *Mr. Dee* and *Mr. Lidon,* on the brief).

PAYNE, J.S.C.

This is a reverse discrimination, hostile work environment action instituted pursuant to *N.J.S.A.* 10:5–12.[1]  At issue is the nature of the proofs that plaintiff must offer in order to establish a *prima facie* case.  In his suit, plaintiff Samuel DeCapua, a white male of Italian descent, seeks damages from his employer, Bell Atlantic—New Jersey, Inc., under the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5–1 to –42, as the result of alleged racially-based harassment by plaintiff's black supervisor, Gary Farrow, occurring in the period from February to December, 1995.  This harassment allegedly took the form of unfairly

---

[1] Plaintiff has also asserted a claim for breach of contract that will be discussed, *infra.*  Plaintiff has voluntarily dismissed claims of constitutional violation and promissory estoppel.

imposed work rules, excessive discipline, threats of discipline, heightened supervisory surveillance, humiliation before coworkers and customers, and the use of racially-charged language. Plaintiff also alleges that his black co-workers were not equally or similarly subjected to discipline or threats of discipline for like infractions, or were subjected to lesser disciplinary sanctions. Additionally, plaintiff alleges that his black co-workers were not subjected to equal or similar supervisory surveillance. Plaintiff further alleges that Farrow expressly linked his antagonism toward DeCapua with plaintiff's race in remarks he made directly to plaintiff and to one of plaintiff's black co-workers, Herman Jackson.

Defendant Bell Atlantic has sought summary judgment on plaintiff's LAD claim. It argues that, because plaintiff is a member of a white racial majority, rather than a member of a racial minority, and his hostile work environment claim is founded on conduct that is not facially race-based, plaintiff must meet a heightened standard to establish his *prima facie* case, and he has failed to do so. Under this heightened standard, Bell Atlantic argues, plaintiff must show, as variously phrased, that Bell Atlantic engages in "broad-based or systematic racism against Caucasians," or that "widespread anti-Caucasian discrimination has occurred at Bell Atlantic," or that Bell Atlantic has engaged in a "pattern of discrimination" against Caucasians. Bell Atlantic argues further that the standard that it has set forth is mandated by the New Jersey Supreme Court's decision in *Erickson v. Marsh & McLennan,* 117 *N.J.* 539, 569 *A.*2d 793 (1990), as followed in *dictum* in *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 605–06, 626 *A.*2d 445 (1993).

In *Erickson,* the Court held, in a case alleging gender-based reverse employment discrimination as a basis for unlawful discharge, that:

plaintiff "must substantiate ... that the 'background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" *Erickson [v. Marsh & McLennan Co., Inc.],* 227 *N.J.Super.* [78], 87 [545 *A.*2d 812 (App.Div.1988) ] (citing *Murray v. Thistledown Racing Club Inc.,* 770 *F.*2d 63, 67 (6th Cir.1985)).

[*Erickson, supra,* 117 *N.J.* at 551, 569 *A.*2d 793.]

This court finds that Bell Atlantic has misconstrued the elements of the test set forth in *Erickson;* particularly, in a case such as this that alleges a hostile work environment based upon reverse discrimination, not wrongful discharge or other allegedly wrongful job action. Although it agrees that *Erickson*'s heightened standard is applicable to this reverse discrimination claim against an employer, it finds that the standard can be met by evidence that does not necessarily include proof of systemic discrimination by the employer against the majority. The basis for this court's determination follows.

A.  A requirement of evidence of systemic discrimination is inconsistent with the nature of hostile work environment claims and subverts *the remedial purpose of such actions.*

In a test established in *McDonnell Douglas v. Green,* 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677 (1973)[2] and adopted in New Jersey, the Unites States Supreme Court held that to establish a *prima facie* circumstantial case of discrimination under federal law, a plaintiff must demonstrate that he/she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection, the position remained open and the employer continued to seek applicants with qualifications comparable to plaintiff's. *Ibid. See also, Peper v. Princeton University Board of Trustees,* 77 *N.J.* 55, 82–83, 389 *A.*2d 465 (1978); *Goodman v. London Metals Exchange Inc.,* 86 *N.J.* 19, 31, 429 *A.*2d 341 (1981); *Andersen v. Exxon Co.,* 89 *N.J.* 483, 492, 446 *A.*2d 486 (1982); *Clowes v. Terminix International, Inc.,* 109 *N.J.* 575, 595–96, 538 *A.*2d 794 (1988).

In *Erickson,* a reverse discrimination claim of wrongful termination, the Court replaced the first prong of the *McDonnell*

---

[2] *See also Texas Dept. of Community Affairs v. Burdine,* 450 *U.S.* 248, 253 n. 6, 101 *S.Ct.* 1089, 1094 n. 6, 67 *L.Ed.*2d 207, 215 n. 6 (1981).

*Douglas* test (that plaintiff belongs to a protected class) with the previously-stated requirement that the plaintiff show "that the background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority." *Erickson, supra,* 117 *N.J.* at 551, 569 *A.*2d 793. In doing so, the Court agreed with those federal courts that reasoned that the use of the simple, self-evident, first prong of *McDonnell Douglas* is appropriate only for claims by minority plaintiffs, because anti-discrimination laws were intended to address " 'a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effect.' " *Ibid.* (*quoting Murray, supra,* 770 *F.*2d at 67). That presumption, the *Erickson* Court held, was inapplicable to the plaintiff before the Court, a white male, because he was a member of a class that has "not historically been victimized by discrimination." *Id.* at 552, 569 *A.*2d 793.

The rationale of *Erickson* appears in the New Jersey Supreme Court's later decision in *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 605–06, 626 *A.*2d 445 (1993), a claim by a female employee that sex harassment had created a hostile work environment. In that case, the Court held that in order to state a claim, a female plaintiff "must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment." *Id.* at 603, 626 *A.*2d 445. Addressing the first prong (that plaintiff suffered discrimination because of her sex), the Court noted that not all sexual harassment is sex-based on its face. *Id.* at 605, 626 *A.*2d 445. It then observed that a plaintiff could nonetheless demonstrate harassment because of sex if she produced evidence of non-facially sex-based harassment accompanied by conduct that was obviously sex-based, or she produced evidence that the conduct at issue was directed only against women. *Ibid.* "All that is required is a showing that it is more likely than not that the harassment occurred because of the plaintiff's sex. For a female plaintiff, that will be sufficient to invoke the rebuttable presumption that the harassment did in fact occur because of the plaintiff's

sex." *Ibid.* In contrast, the Court observed in *dictum*, in order for a male to invoke the presumption in a sex harassment case in which the conduct was facially neutral, he must make the additional showing that the defendant employer is the rare employer who discriminates against the historically-privileged majority group. *Id.* at 605–06, 626 A.2d 445 (*citing Erickson, supra*, 117 N.J. at 551, 569 A.2d 793).

■  It is Bell Atlantic's position in this case that the conduct upon which plaintiff relies to establish his claim is facially neutral,[3] and thus that he must meet *Erickson*'s burden of establishing a pattern of discrimination against whites, or discrimination against whites that is more "systemic" and "widespread" than the harassment of one employee by one supervisor.

This Court disagrees with Bell Atlantic.  Such a requirement could preclude an otherwise deserving plaintiff from having his day in court on a claim—employment discrimination based upon a hostile work environment—that has been construed in every other context to be actionable on evidence of the conduct of one supervisor toward one employee.

Both the reasoning that underlies the recognition of a cause of action for hostile work environment employment discrimination and the factual circumstances that have been recognized as establishing such a claim militate against a requirement that plaintiff demonstrate "widespread" discrimination or "a pattern of" discrimination against those who share the plaintiff's protected status.  Hostile work environment claims are recognized because courts have acknowledged that adverse treatment of an individual that has led to psychological injury, humiliation and/or intimidation as a necessary part of an employee's work can be a form of employment discrimination, even if the employee continues in the job.  The United States Supreme Court has rejected the proposi-

---

[3] This court disagrees with Bell Atlantic's position that plaintiff has failed to demonstrate some facially race-based conduct. However, this showing alone may not *ipso facto* serve to establish plaintiff's *prima facie* case.

tion that Title VII of the Civil Rights Act, by prohibiting discrimination with respect to "compensation, terms, conditions or privileges" of employment, evinces a legislative intent to restrict cognizable claims to those that show a "tangible loss" of "an economic character" and thus to preclude claims based on the "purely psychological aspects of the workplace environment." *See Meritor Savings Bank, FSB v. Vinson*, 477 *U.S.* 57, 64, 106 *S.Ct.* 2399, 2404, 91 *L.Ed.*2d 49, 58 (1986).

In *Meritor*, the Supreme Court accepted the body of federal case law recognizing a cause of action for discrimination based upon workplace harassment that had originated fifteen years before and had subsequently been applied to harassment based on race, religion, and national origin. *Id.* at 66, 106 *S.Ct* at 2405, 91 *L.Ed.*2d at 59 (*citing, inter alia, Rogers v. EEOC*, 454 *F.*2d 234 (5th Cir.1971), *cert. denied*, 406 *U.S.* 957, 92 *S.Ct.* 2058, 32 *L.Ed.*2d 343 (1972)). The *Meritor* Court observed that this "substantial body of judicial decisions" had held that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* 477 *U.S.* at 65, 106 *S.Ct.* at 2405, 91 *L.Ed.*2d at 59. The Court then approved the extension of these principles to a cause of action based on harassment due to a plaintiff's gender, recognizing that " '[s]exual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality.' " *Id.* at 67, 106 *S.Ct.* at 2405, 91 *L.Ed.*2d at 59 (*quoting Henson v. Dundee*, 682 *F.*2d 897, 902 (11th Cir.1982)). The Court further emphasized that there was no need to show economic injury by holding that harassment based on gender did not require a showing that the plaintiff was forced to submit to the harassment in order to get or keep a job or to obtain an employment benefit. *Id.* at 67–68, 106 *S.Ct.* at 2406, 91 *L.Ed.*2d at 60.

*Meritor* also recognized that an actionable hostile work environment claim could be created when one supervisor harassed one employee. "Respondent brought this action against [her supervi-

sor] Taylor and the bank, claiming that during her four years at the bank she had 'constantly been subjected to sexual harassment' by Taylor in violation of Title VII." *Id.* at 60, 106 *S.Ct.* at 2402, 91 *L.Ed.*2d at 55. The Court noted that at the bench trial in the federal district court, plaintiff-respondent had never presented evidence, either in her case in chief or in rebuttal, of a "pattern and practice" by her supervisor, Taylor, "relating to sexual advances to other female employees." *Id.* at 61, 106 *S.Ct.* at 2402, 91 *L.Ed.*2d at 56. Nevertheless, the Court held that the plaintiff's allegations, including as they did, "pervasive harassment," were "plainly sufficient" to state a hostile work environment claim. *Id.* at 67, 106 *S.Ct.* at 2405–06, 91 *L.Ed.*2d at 60.

In same-sex harassment hostile work environment cases, courts have uniformly rejected the idea that the work environment must be shown to be hostile to all, or many, workers having the plaintiff's protected status. All that is required is a showing that the environment is discriminatorily hostile to the plaintiff. *See, e.g ., Johnson v. Community Nursing Services,* 932 *F.Supp.* 269, 273 (D.Utah 1996) (recognizing as discriminatory same-sex female harassment directed only to women perceived as potentially receptive to lesbian advances); *Tanner v. Prima Donna Resorts,* 919 *F.Supp.* 351, 354 (D.Nev.1996) (in same-sex male harassment case, finding that a claim of a hostile work environment is "an individual claim which is ripe before the work environment has been poisoned for all workers of one sex or the other"); *Sardinia v. Dellwood Foods,* 1995 WL 640502 (S.D.N.Y. Nov.1, 1995), *motion to certify appeal granted,* 1995 WL 710205 (S.D.N.Y. Dec.1, 1995) (recognizing claim based on same-sex male harassment).

As a matter of course, cognizable hostile work environment claims often involve allegations that only one employee is the harasser and only one employee is the harassed. *See, e.g., Konstantopoulos v. Westvaco Corp.,* 112 *F.*3d 710 (3d Cir.1997) (male supervisor, female employee); *Lynch v. New Deal Delivery Service, Inc.,* 974 *F.Supp.* 441 (D.N.J.1997) (same); *EEOC v. Domino's Pizza, Inc.,* 909 *F.Supp.* 1529 (M.D.Fla.1995), *aff'd,* 113 *F.*3d

1249 (11th Cir.1997), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 687, 139 *L.Ed.*2d 634 (1998) (reverse sex discrimination); *Davis v. Sheraton Society Hill Hotel,* 907 *F.Supp.* 896, 905 (E.D.Pa.1995) (allegations by male plaintiff about female supervisor's conduct toward him sufficient to establish sex-based harassment claim and trigger court's examination of plaintiff's *prima facie* case); *Kelly v. Bally's Grand, Inc.,* 285 *N.J.Super.* 422, 434, 667 *A.2d* 355 (App.Div. 1995) (consequences of supervisor's age-based bias toward plaintiff sufficient to permit hostile work environment cause of action).

In sum, to preclude any further examination of the totality of the circumstances[4] in order to determine whether a claimant has established a *prima facie* case of discriminatory hostile work environment on the basis that the claimant's allegations involving harassing conduct only against himself by only one supervisor, flies directly in the face of well-established state and federal precedent construing hostile work environment claims.

B. *Erickson*'s standard must be construed broadly, *particularly in a hostile work environment context.*

In *Erickson,* the New Jersey Supreme Court considered a claim of employment discrimination based on disparate treatment that allegedly resulted in a tangible economic loss to the plaintiff, *i .e.,* an "adverse employment decision." Such a claim differs markedly from one such as that presented here by plaintiff DeCapua of harassment that creates "working environments so heavily polluted with discrimination" as to destroy workers' "emotional and psychological stability." *Meritor, supra,* 477 *U.S.* at 66, 106 *S.Ct.* at 2405, 91 *L.Ed.*2d at 59 (*quoting Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 *U .S.* 957, 92 *S.Ct.* 2058, 32 *L.Ed.*2d 343 (1972)). Logically, therefore, the *prima facie* elements of these two separate strains of "the cancer of discrimina-

---

[4] *See, Harris v. Forklift Systems, Inc.,* 510 *U.S.* 17, 23, 114 *S.Ct.* 367, 371, 126 *L.Ed.*2d 295, 302–03 (1993) (adopting totality of the circumstances analysis of hostile work environment claims). *See also, Lehmann, supra,* 132 *N.J.* at 603–04, 626 *A.2d* 445.

tion" (*Lehmann, supra,* 132 *N.J.* at 600, 626 *A.*2d 445) may differ as well. Adverse employment decision claims inherently require a comparison between how the plaintiff and "someone else" of a different race, gender, religion, or national origin is treated. Another, occupying a different status, must get the job or the promotion in order for plaintiff to establish a *prima facie* case. *See Erickson, supra,* 117 *N.J.* at 554–55, 569 *A.*2d 793 (plaintiff did not establish a *prima facie* case because he failed to show that, after his termination, he was replaced at all, let alone by a woman). Hostile work environment claims do not require this comparison, since as previously noted, they may depend on an analysis of individual relationships.

The "unusual employer" standard adopted in *Erickson,* arose out of an alleged disparate treatment, adverse employment decision case. The standard was first enunciated in 1981 by D.C. Circuit Judge Abner Mikva in *Parker v. Baltimore and Ohio Railroad,* 652 *F.*2d 1012, 1017, a case in which a white railroad porter alleged that his failure to obtain a transfer or promotion was the result of his employer's affirmative action program, and thus the result of reverse discrimination. In that case, Judge Mikva recognized that the first element of a *prima facie* claim of discrimination established by *McDonnell Douglas*—that the claimant was a member of a racial minority—could not be utilized in a reverse discrimination context, because the presumption of discrimination that existed as the result of the nation's past discriminatory history was inapplicable to a member of a racial majority.

> Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated, for only in that context can it be stated as a general rule that the "light of common experience" would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society.
>
> [*Id.* 652 *F.*2d at 1017.]

The rationale of *Parker* was adopted by other federal courts: earliest and most notably, by the Sixth and Tenth Circuits. *See, e .g., Murray, supra,* 770 *F.*2d at 67; *Livingston v. Roadway*

*Express,* 802 *F.*2d 1250, 1252 (10th Cir.1986). As previously noted, *Parker*'s rationale was also adopted by the New Jersey Supreme Court in its 1990 decision in *Erickson*. *Id.,* 117 *N.J.* at 551–52, 569 *A.*2d 793. At the time of the *Erickson* decision, *Parker* and its progeny, including a trio of later decisions by the D.C. Circuit,[5] had been interpreted to require a threshold showing by plaintiff in a reverse discrimination case that (1) the particular employer had some reason or desire to discriminate invidiously against whites (through workforce statistics or evidence of pressure on the hiring authority to hire minorities) and (2) there was something suspicious about the facts of the case that raised an inference of discrimination (through evidence, *e.g.,* that normal hiring criteria were altered or ignored). *See, Harding v. Gray,* 9 *F.*3d 150, 153 (D.C.Cir.1993) (*citing Daye, supra,* 655 *F.*2d at 260– 61; *Lanphear, supra,* 703 *F.*2d at 1315; *Bishopp, supra,* 788 *F.*2d at 786–87).

However, in *Harding,* a decision by the D.C. Circuit rendered after the New Jersey Supreme Court's decision in *Erickson,* Judge Mikva clarified the court's prior rulings, and in doing so, rejected the position that a plaintiff was required to demonstrate both that the employer had a reason or desire to discriminate against the majority [6] and that there was something "fishy" about the facts of the case at hand that raised the inference of discrimi-

---

[5] *Daye v. Harris,* 655 *F.*2d 258 (1981); *Lanphear v. Prokop,* 703 *F.*2d 1311 (1983); and *Bishopp v. District of Columbia,* 788 *F.*2d 781 (1986).

[6] An examination of decisions prior to *Harding* reveals that courts have never held that "background circumstances" *must* include a showing of "widespread" discrimination or "a pattern of" discrimination. Nor has there necessarily been such a showing in cases in which the court did find that a majority plaintiff had established the elements of his or her proof. When a majority plaintiff has not established a *prima facie* case, however, a court will often mention the lack of such a showing as an additional factor supporting dismissal, or will cite other kinds of statistics that demonstrate an environment in which discrimination as alleged is unlikely. Similarly, in cases in which a *prima facie* case has been found to exist, the court may cite other kinds of statistics that demonstrate a plausible basis for plaintiff's claim.

nation. *Harding, supra,* 9 *F.*3d at 153. In that case, a white carpenter alleged that his qualifications were superior to those of the black employee who was promoted to the position that plaintiff sought. Addressing his claim, Judge Mikva stated:

> Apparently, we have never had occasion to state clearly that the second type of "background circumstance" may create a prima facie case by itself. Accordingly, we will take this opportunity to hold precisely that. "Background circumstances" need not mean "some circumstance in the employer's background." On the contrary, other evidence about the "background" of the case at hand—including an allegation of superior qualifications—can be equally valuable.
>
> It is true, as appellees argue, that we have never yet been confronted with a prima facie case based entirely upon the plaintiff's superior qualifications. But we see nothing in *Parker,* nor any of our cases, that would suggest superior qualifications are not enough. Indeed, such an interpretation would be inconsistent both with *Parker* and with the essential purpose of the "background circumstances" test: determining when an employer's conduct raises an inference of discrimination under the Supreme Court's *McDonnell Douglas/Burdine* standard.
>
> [*Id.* at 153.]

The court noted that a rational employer would wish to promote the most qualified candidate, because it is in the employer's best interest to do so. When an employer acts contrary to its best interests, then it is proper to infer a discriminatory motive. *Id.* at 153–54. "As the Supreme Court has observed, 'we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.'" *Id.* at 154 (*quoting, Furnco Construction Corp. v. Waters,* 438 *U.S.* 567, 577, 98 *S.Ct.* 2943, 2949–50, 57 *L.Ed.*2d 957, 967 (1978)). "Absent a legitimate reason for the employer's action," irrational conduct by an employer raises an inference of discrimination against the majority white employee. *Harding, supra,* 9 *F.*3d at 154. In conclusion, Judge Mikva observed:

> The "background circumstances" requirement is not an additional hurdle for white plaintiffs. On the contrary, it is a faithful transposition of the *McDonnell Douglas/Burdine* test for ordinary race discrimination cases into the reverse discrimination context. As such, it ensures that white plaintiffs have the same rights as minority plaintiffs. For both, Title VII requires that they state a prima facie case, consisting of facts and circumstances sufficient to raise an inference of discrimination. "Background circumstances" means simply that in our society, where "reverse discrimination" is the exception, white plaintiffs must show more

than the mere fact that they are white before their non-selection in favor of a minority candidate will raise an inference of discrimination.

*[Ibid.]*

Judge Mikva's determination in *Harding* to eliminate as a requirement in a reverse discrimination case a showing by plaintiff of systemic discrimination was made in a discriminatory job action case.[7] Its logic applies with even greater force in a hostile work environment context for all the reasons set forth in the first part of this opinion. For that reason, it can be predicted that when the New Jersey Supreme Court directly addresses the issue of reverse discrimination in a hostile work environment case, it will adopt the formulation established by the D.C. Circuit in *Harding*. Anticipating that result, this court adopts that formulation as the governing standard here.

Therefore, this court finds that where, as in the reverse-discrimination, hostile work environment case at bar, evidence of "some circumstance in the employer's background," or, as Bell Atlantic argues, evidence that there is widespread discrimination against whites at Bell Atlantic or that there has been a pattern of

---

[7] Indeed, all of the cases upon which *Erickson* relies (117 *N.J.* at 551–52, 569 *A.*2d 793) involve allegations of discriminatory job action, not harassment. *See, Murray, supra,* 770 *F.*2d 63 (white female employee claiming reverse discrimination in constructive discharge as a result of her refusal to sign a statement acknowledging that evidence of future monetary shortages would result in dismissal on the basis of incompetence); *Livingston, supra,* 802 *F.*2d 1250 (male truck driver claiming employer's limitation on employees' height discriminated against him on the basis of sex); *Jasany v. United States Postal Serv.,* 755 *F.*2d 1244 (6th Cir.1985) (male claiming that discharge was based on sex); *Jones v. Slater Steels Corp.,* 660 *F.Supp.* 1570 (N.D.Ind.1987) (male, terminated from employment, claiming sex discrimination); *Rivette v. United States Postal Serv.,* 625 *F.Supp.* 768 (E.D.Mich.1986) (white employee who was denied promotion alleging race discrimination).

Similarly, with the exception of *Lehmann*'s *dictum,* all New Jersey decisions applying *Erickson*'s enhanced evidentiary standard have been rendered in connection with claims of discriminatory job actions. *See, Rivera v. Trump Plaza Hotel & Casino,* 305 *N.J.Super.* 596, 702 *A.*2d 1359 (App.Div.1997) (discharge); *Wachstein v. Slocum,* 265 *N.J.Super.* 6, 625 *A.*2d 527 (App.Div. 1993) *cert. denied,* 134 *N.J.* 563, 636 *A.*2d 521 (1993).

discrimination against whites, is not relevant to the cause of action being advanced, plaintiff should be required instead to put forth "other evidence about the 'background' of the case at hand" to establish his claim that discriminatory conduct has occurred. "More than the mere fact that he is white" does not translate into "widespread discrimination against whites."

■ What sort of "other evidence about the 'background' of the case at hand" would be sufficient, then, to establish plaintiff's *prima facie* claim of a discriminatorily hostile work environment and to withstand summary judgment? Such a determination, like many in an employment discrimination context, must be made on a case-by-case basis. Here, plaintiff DeCapua has offered some direct evidence of facially race-based conduct by his supervisor: specifically, that Farrow, early in his tenure, called DeCapua "white boy" and told DeCapua that he would not "survive him." Further, plaintiff attests that Farrow called him "white boy" [8] while criticizing his work when a customer was present or in hearing range.[9] Plaintiff has offered "other evidence" in the form

---

[8] The use of "white boy" by a black supervisor in this case can be distinguished from its use in *Ditzel v. University of Medicine & Dentistry of New Jersey*, 962 *F.Supp.* 595, 600, 605 (D.N.J.1997). There, a comment by a white female supervisor to a white male employee, when shown a list of white male potential nominees to the University's wholly white male Board that "just what we need [is] another white boy" was deemed sarcastic and possibly ill-advised, but not actionable.

[9] A case of employment discrimination can proceed upon direct evidence of a discriminatory motive alone rather than on circumstantial evidence. In such circumstances, there is no need to present the "background circumstances" required by *Parker*. *See, Notari v. Denver Water Department,* 971 *F.2d* 585, 590 (10th Cir.1992).

> We emphasize that a plaintiff who attempts to state a prima facie case in this fashion is not entitled to rely on the presumption that is implicit in the *McDonnell Douglas* prima facie case analysis. In other words, it is not enough, under this alternative formulation, for a plaintiff merely to allege that he was qualified and that someone with different characteristics was the beneficiary of the challenged employment decision. Instead, the plaintiff must allege and produce evidence to support specific facts that are sufficient

of a certification by plaintiff's black co-worker, Jackson, wherein Jackson states that Farrow told him he was going to be harder on certain white employees than on blacks, and that Farrow claimed to him that he "bothered" the "white boys" with job-related surveillance more than he did Jackson. Mr. Jackson stated additionally that on several other occasions, he heard Farrow utilize racial epithets with regards to plaintiff. However, he provided no specifics regarding the occasions or the words spoken.

Plaintiff has also offered other more facially neutral evidence to support his claim of discriminatory harassment by Farrow that, if proven at trial, establishes that neither supervision nor discipline was meted out in a racially even-handed fashion. Plaintiff himself has testified that (1) he was discriminatorily docked or chastised for lateness; (2) he was denied vacation time as the result of strict application of work rules that were relaxed for black co-employees; (3) his work was supervised far more closely than that of blacks; (4) he was humiliated before or in ear-shot of customers; (5) he was talked down to; (6) he was threatened with disciplinary action for failure to submit customer satisfaction forms, whereas minority employees were not; (7) he was "set up" in connection with the incident that led to his 30–day suspension; and (8) the 30–day penalty was disproportionate to the offence and far greater than that given to a black co-employee, Al Parks, for a far more serious infraction. Plaintiff's claims regarding Farrow's disparate treatment of employees who reported late is corroborated by union delegate Sheridan, by co-employee DelliSanti, and by co-employee Pellegrino. Sheridan also corroborated plaintiff's claim that he was set up by Farrow for discipline, and, to some extent, plaintiff's claim of disparate, racially-based treatment in the discipline of plaintiff and Parks. Sheridan stated as well that Farrow "flipped out" when another white employee, Pellegrino, stood behind him, but never objected to such conduct by blacks.

---

to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred.
[*Ibid.*]

This court finds that it cannot ignore this showing and finds, as well, that if proven, it raises the inference that, but for plaintiff's race, the conduct would not have occurred.[10] Of course, Bell Atlantic disputes the foregoing, demonstrates inconsistencies in the testimony, and offers facts that suggest any conduct by Farrow resulted from plaintiff's poor employment record or was impelled by factors unrelated to race. Although Bell Atlantic's evidence is persuasive, it is not conclusive. As a consequence, this court holds that plaintiff has adduced sufficient evidence to withstand summary judgment directed to the sufficiency of plaintiff's evidence under *Erickson's* test.

Bell Atlantic claims as well that, as a matter of law, plaintiff has not set forth sufficient facts to support his claim of conduct sufficiently severe or pervasive to make a reasonable white male believe that, during the ten-month period of Farrow's supervision, the conditions of plaintiff's employment had been altered and that the working environment had become hostile or abusive. As noted previously, an analysis of the conditions of plaintiff's employment requires a consideration of all the circumstances, not individual incidents in isolation. *Harris, supra,* 510 *U.S.* at 23, 114 *S.Ct.* at 371, 126 *L.Ed.*2d at 302; *Lehmann, supra,* 132 *N.J.* at 604, 626 *A.*2d 445. *See also, West v. Philadelphia Electric Co.,* 45 *F.*3d 744, 756 (3d Cir.1995). Further, that analysis does not depend on the number of incidents or the duration of the alleged harassment, but rather on the nature and intensity of the complained-of conduct. *Lehmann, supra,* 132 *N.J.* at 606–07, 626 *A.*2d 445 (adopting severe *or* pervasive test of conduct); *Daniels*

---

10 In this workplace harassment setting, therefore, *Erickson's* standard does not differ to any measurable extent from the standard applicable to anyone else seeking to demonstrate that conduct deemed by the plaintiff to be objectionable was the result of discrimination, not any other factor. *See, Lehmann,* 132 *N.J.* at 605, 626 *A.*2d 445. In each case, the plaintiff must adduce evidence that the conduct at issue occurred *because of* plaintiff's protected status. Evidence of status alone, is insufficient. By this mechanism, courts (and litigants) can still police those cases in which a claim of reverse discrimination is factually unfounded.

*v. Essex Group, Inc.*, 937 *F.*2d 1264, 1275 (7th Cir.1991) (proof of a hostile work environment does not depend on a threshold number of incidents); *Konstantopoulos, supra*, 112 *F.*3d at 716–18 (10–day period of harassment could give rise to hostile work environment claim). Nonetheless "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's [and LAD's] purview." *Harris, supra*, 510 *U.S.* at 21, 114 *S.Ct.* at 370, 126 *L .Ed.*2d at 302.

In *Harris*, the Court listed the following factors as relevant to a determination of the existence of a discriminatorily hostile environment:

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

[*Id.*, 510 *U.S.* at 23, 114 *S.Ct.* at 371, 126 *L.Ed.*2d at 302–03.]

Although the call is a close one in this case, this court finds that plaintiff's evidence of the conduct at issue, particularly if credit is given to plaintiff's claims of intent on Farrow's part to treat plaintiff differently because of his race and to make life sufficiently miserable for him to cause him to leave his employment, is sufficient to withstand summary judgment on this ground, as well.

## C. *Plaintiff's claim of breach of contract.*

In addition to his claims under the LAD, plaintiff claims that Bell Atlantic breached its contract with him. In support of that claim, plaintiff relies on a document entitled "Equal Employment Opportunity & Affirmative Action" that provides in relevant part:

Supervisors must ensure that all subordinates are free from harassment of any kind. Neither employees nor employees of contractors working for the company are to be ridiculed, belittled, embarrassed or intimidated by incidents like the telling of racist, sexist, ethnic or age-related jokes, slurs, comments or the deliberate and discriminatory exclusion of employees from work-related activities. The company will not tolerate any such activity that has a demeaning effect on any employee, and violations of this policy will result in discipline up to and including dismissal.

Because plaintiff's common-law breach of contract claim [11] dupli-
cates his statutory claim under New Jersey's Law Against Dis-
crimination, it is barred. *Catalane v. Gilian Instrument Corp.*,
271 *N.J.Super.* 476, 491–92, 638 *A.*2d 1341 (App.Div.) *certif. de-
nied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994).

D. *Conclusion*

For the reasons set forth in this opinion, summary judgment
will be granted on plaintiff's claim of breach of contract. It will be
denied on plaintiff's claim of reverse racial discrimination, institut-
ed pursuant to the provisions of the New Jersey Law Against
Discrimination.

---

[11] No opinion is expressed as to (1) whether promulgation of the document in
question creates a contract; (2) whether it is superseded by the collective
bargaining agreement between plaintiff's union and Bell Atlantic; and (3)
whether plaintiff's contractual claim is barred as the result of the operation of
federal Labor Management Relations Act.