**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5368-18

ROBERT WILLIAMS,

     Plaintiff-Appellant,

v.

CASINO REINVESTMENT
DEVELOPMENT AUTHORITY,
a/k/a CRDA, DANIEL MACK,
and ROSILAND KINCADE,

     Defendants-Respondents.

_____

Submitted March 24, 2021 – Decided July 13, 2021

Before Judges Ostrer, Vernoia, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-1500-16.

Timothy J. McIlwain, attorney for appellant.

Riker Danzig Scherer Hyland & Perretti, LLP, attorneys for respondents (Adam J. McInerney, of counsel and on the brief).

PER CURIAM

Plaintiff Robert Williams appeals from an order granting defendant Casino Reinvestment Development Authority (CRDA or defendant) summary judgment on plaintiff's claims defendant terminated his employment in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. More particularly, plaintiff contends the motion court erred by granting summary judgment on his claims defendant unlawfully terminated his employment because of his race—Caucasian—and in retaliation for engaging in protected activity under the LAD. We find no merit to plaintiff's arguments and affirm.

I.

Following approximately four years of employment with defendant, plaintiff filed a complaint alleging defendant violated the LAD by terminating his employment because he was Caucasian and in retaliation for engaging in a "protected activity"—filing a complaint with defendant concerning a co-employee, defendant Daniel Mack.[1] Defendant terminated plaintiff's employment following Mack's report of plaintiff's workplace misconduct and an outside law firm's investigation into the allegations. Plaintiff also claimed Mack

[1] In our summary of the allegations, we refer to plaintiff's second amended complaint because it was the operative pleading when the court entered the summary judgment order challenged on appeal.

and another co-worker, Rosalind Kincade, aided and abetted in defendant's retaliation against him.[2] In the complaint, plaintiff asserted LAD claims against defendant for reverse race discrimination, disability discrimination, and retaliation, and against Mack and Kincade for aiding and abetting retaliation.[3]

The trial court set an initial discovery end date of December 28, 2017. The court later granted the parties' joint request for a sixty-day discovery extension. Plaintiff moved for a second sixty-day extension, which the court granted, setting a new end date of May 30, 2018. On May 3, 2018, plaintiff moved for another sixty-day extension, asserting defendant had not provided documents requested orally during depositions; "[p]laintiff ha[d] very recently

---

[2] In the record before the motion court, Rosalind Kincade is also referred to as Rosalind Kincaid. We use the surname Kincade because it is the one by which she was identified in the complaint, the captions of the pleadings filed in the trial court, and the captions of the papers filed on appeal.

[3] The court granted defendant summary judgment on the disability discrimination claim and granted Mack and Kincade summary judgment on the aiding and abetting claim. In his brief on appeal, plaintiff does not challenge the court's order granting summary judgment on those claims. We therefore do not address any issues related to those claims, and we affirm the court's order granting summary judgment on each of them. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) (finding "[a]n issue not briefed on appeal is deemed waived"); Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008) (same).

served a formal [r]equest" for documents on defendant; and defendant had not yet conducted its court-ordered redeposition of plaintiff.

Defendant completed the redeposition of plaintiff on May 8, 2018. On May 17, defendant served its response to plaintiff's formal demand for documents and filed opposition to plaintiff's motion to extend discovery. One week later, defendant moved for summary judgment, and plaintiff thereafter cross-moved for summary judgment.

The Summary Judgment Record

Prior to addressing the facts relied on by the parties in support of their motions, we note that "[w]e review de novo the trial court's grant of summary judgment, applying the same standard as the trial court." Abboud v. Nat'l Union Fire Ins. Co., 450 N.J. Super. 400, 406 (App. Div. 2017). This standard mandates the grant of summary judgment "if the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).

A-5368-18

In our review of a summary judgment record, we limit our determination of the undisputed facts to those properly presented in accordance with Rule 4:46-2. Under the Rule:

> [A] party moving for summary judgment is required to submit a "statement of material facts" . . . "set[ting] forth in separately numbered paragraphs a concise statement of each material fact as to which the movant contends there is no genuine issue together with a citation to the portion of the motion record establishing the fact or demonstrating that it is uncontroverted."
>
> [Claypotch v. Heller, Inc., 360 N.J. Super. 472, 488 (App. Div. 2003) (quoting R. 4:46-2(a)).]

"[A] party opposing a motion for summary judgment [must] 'file a responding statement either admitting or disputing each of the facts in the movant's statement.'" Ibid. (quoting R. 4:46-2(b)). "[A]ll material facts in the movant's statement which are sufficiently supported will be deemed admitted for purposes of the motion only, unless specifically disputed by citation conforming to the requirements of paragraph (a) demonstrating the existence of a genuine issue as to the fact." R. 4:46-2(b).

Rule 4:46-2's requirements are "critical" and "entail[] a relatively undemanding burden." Housel v. Theodoridis, 314 N.J. Super. 597, 604 (App. Div. 1998). They were "designed to 'focus [a court's] . . . attention on the areas of actual dispute' and [to] 'facilitate the court's review' of the motion."

Claypotch, 360 N.J. Super. at 488 (second alteration in original) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 1.1 on R. 4:46-2 (2003)). As such, a trial court must decide a motion for summary judgment based only upon the "factual assertions . . . that were . . . properly included in the motion [for] and [in opposition to] . . . summary judgment" pursuant to Rule 4:46-2. Kenney v. Meadowview Nursing & Convalescent Ctr., 308 N.J. Super. 565, 573 (App. Div. 1998); see also Lombardi v. Masso, 207 N.J. 517, 549 (2011) (Rivera-Soto, J., dissenting) (stating a trial court must decide a summary judgment motion "[b]ased on the [Rule]-defined, specifically tailored summary judgment record before it"). Thus, we will only consider "those [properly included] factual assertions" on appeal. Kenney, 308 N.J. Super. at 573; see also Lombardi, 207 N.J. at 549 (Rivera-Soto, J., dissenting) ("That limitation— that a summary judgment determination is defined and limited by the summary judgment record—also applies on appeal."). Therefore, in our review of the court's summary judgment order, we rely solely on the undisputed facts

6

established by the parties' Rule 4:46-2 statements.[4] See Kenney, 308 N.J. Super. at 573.

We have carefully considered the Rule 4:46-2 statements of the parties and glean the following undisputed facts.[5] Defendant, located in Atlantic City, "is an independent authority in, but not of, the New Jersey State Department of Treasury." Plaintiff, a Caucasian male, began working for defendant in April 2011.[6] He was first employed as a construction manager and, in that position,

---

[4] As a result, we reject plaintiff's frequent reliance, in the terse statement of facts in his brief on appeal, on deposition testimony asserting purported facts that were never presented to the motion court in accordance with Rule 4:46-2.

[5] Our review of plaintiff's responses to defendant's statement of material facts reveals that most of the responses were either not supported by any citation to competent record evidence or were supported only by citation to plaintiff's statement of facts. Additionally, many of plaintiff's denials that are supported by citation to plaintiff's statement of material facts refer to purported facts that do not refute defendant's factual assertions to which the response is made. It is unnecessary that we detail the manner in which each of plaintiff's responses to defendant's statement of material facts do not provide a denial in accordance with Rule 4:46-2, but we note that based on our analysis of the parties' Rule 4:46-2 statements, we deem the material facts set forth in defendant's statement admitted for purposes of defendant's summary judgment motion. See R. 4:46-2(b) ("[A]ll material facts in the movant's statement which are sufficiently supported will be deemed admitted for purposes of the motion only, unless specifically disputed by citation [to the record] . . . .").

[6] Although not supported by citation to the record, plaintiff asserts in his Rule 4:46-2 statement, and defendant admits, plaintiff was employed by the Atlantic City Special Improvement District (SID) from 2000 until his employment with

7                                                                    A-5368-18

"he supervised eleven employees and was responsible for building parks and performing building maintenance and landscaping services within Atlantic City's tourism district." Defendant had an anti-harassment and anti-discrimination policy, which plaintiff received in approximately October 2014.

In December 2014, defendant promoted plaintiff to the position of Operations Manager. As a result of the promotion, plaintiff became responsible for the supervision "of approximately [sixty] employees, including [eight] supervisors in the General Maintenance department of [defendant]'s Special Improvement District Division [(SIDD)]." Mack, an African American male, was a supervisor in the SIDD. He reported to Maurice Cherry and Angel

---

defendant. The SID was created pursuant to The Pedestrian Mall and District Improvement Act, N.J.S.A. 40:56-65 to -89, which authorizes the creation of municipal SIDs and management corporations to administer the SIDs, with the goal of encouraging "self-help programs to enhance . . . local business climates." N.J.S.A. 40:56-65(b). After passage of the Atlantic City Tourism District Act in 2011, N.J.S.A. 5:12-218 to -233, which "prohibited" the city "from 'designat[ing] the tourism district or any portion thereof as an area in need of redevelopment or an area in need of rehabilitation, or adopt[ing] a redevelopment plan for any property within the tourism district,'" Casino Reinvestment Dev. Auth. v. Birnbaum, 458 N.J. Super. 173, 179 (App. Div. 2019) (alterations in original) (quoting N.J.S.A. 5:12-220(f)), defendant "acquired most of the assets and specifically enumerated liabilities of the [c]ity SID, and hired many, but not all, of the employees who previously worked for the . . . SID," including plaintiff.

Torres—two SIDD assistant managers who reported to plaintiff. Plaintiff reported to the director of the SIDD, Rick Santoro, another Caucasian male.

Kincade, an African American woman, was defendant's Human Resources (HR) Director. Kincade's duties included "investigat[ing] complaints of discrimination and harassment, . . . interviewing witnesses, making findings, reporting her findings to upper management[,] and making recommendations for discipline."

Prior to or on about March 3, 2015, Mack told Cherry plaintiff had directed certain offensive conduct to him. Cherry advised Mack to contact HR. On or about March 3, Mack called Kincade "and asked for a meeting with [her], . . . Santoro[,] and [plaintiff] regarding [plaintiff's] inappropriate conduct toward him." Mack met with Kincade and Santoro, and informed them plaintiff "made comments to him questioning his sexuality, accusing him of raping his foster children[,] and making a racial comment related to white being pure like clouds and black being like crows, death and grungy." Mack later testified he did not say plaintiff "insulted African Americans," but he considered plaintiff's statement concerning white and black to be "racist." HR had not received any prior complaints concerning plaintiff.

A-5368-18

Santoro and Kincade met with plaintiff and Mack on March 9, 2015. At this meeting, plaintiff "admitted making comments [to Mack] about race and sexuality . . . but denied making a comment about Mack abusing his foster children." Santoro informed plaintiff "his comments and behavior were unacceptable in the workplace." Plaintiff did not make any complaints to Santoro or Kincade concerning Mack prior to or during the meeting. Following the meeting, Kincade questioned Lance Hamilton—a General Maintenance supervisor—and Cherry "about Mack's allegations."

Hamilton told Kincade "he witnessed [plaintiff] make a disparaging comment to Mack in the [company] lunchroom" to the effect of, "[Y]ou can tell you're the type of person who rapes his kids when he goes home." "Hamilton [also] told [Kincade] that [plaintiff] constantly [made] biased statements about race and religion in the lunchroom." Hamilton further stated plaintiff "questioned 'how come black people do most of the crime and white people do less[,]' and that [plaintiff] made jokes about Hamilton being Muslim related to bombs and terrorism."[7]

---

[7] This factual assertion in defendant's <u>Rule</u> 4:46-2 statement is denied by plaintiff, but the denial is unsupported by a citation to competent record evidence. In support of the denial, plaintiff cites to "#18-22, 44-47" of his own statement of facts—a range to which he cites multiple times in support of his

"Cherry told [Kincade] that Mack told him he was hurt and embarrassed by [p]laintiff's conduct and that he told Mack to document everything and to set up a meeting with Santoro and Human Resources." Further, Cherry advised Kincade "that a lot of the SID[D] employees do not like to deal with [p]laintiff because they believe he creates a hostile work environment."

Kincade prepared a memorandum concerning her findings and relayed the findings to Santoro and defendant's general counsel, Paul G. Weiss. On March 12, 2015, defendant "suspended [p]laintiff pending the outcome of its investigation for making unprofessional and inappropriate statements to his subordinates." "The decision to suspend [p]laintiff was made by Santoro with the approval of Weiss and [defendant]'s then[-e]xecutive [d]irector, John Palmieri," all three of whom are Caucasian. Kincade and Mack "were [not] consulted []or otherwise involved in the decision to suspend [p]laintiff." At the

---

denials—but the cited statements of fact are unrelated to Hamilton's report concerning plaintiff's questions about race and "jokes" about Hamilton's religion. In any event, each of plaintiff's denials is required to be accompanied by "a citation to the portion of the motion record establishing the fact or demonstrating that it is uncontroverted." R. 4:46-2(a) to (b). Otherwise, defendant's "sufficiently supported [facts] will be deemed admitted for purposes of the motion." R. 4:46-2(b). The Rule mandates that each statement and denial of fact be accompanied by citation to the record. R. 4:46-2(a) to (b). Plaintiff's citations to his own statement of facts, aside from being unresponsive to the factual assertions plaintiff attempts to deny, do not otherwise conform with the requirements of the Rule.

time of his suspension, plaintiff had not made any allegations of misconduct against Mack.[8]

Following plaintiff's suspension and defendant's notification there would be an investigation, plaintiff's counsel sent a March 17, 2015 "formal internal complaint" letter to Weiss "requesting an investigation of certain conduct allegedly committed by Mack." Specifically, the letter alleged Mack:

> (1) admitted that he is racist against white people; (2) accused [p]laintiff's "people of raping African-American women and dragging them into slavery on boats"; (3) stated to [p]laintiff that white people have killed more black people than the amount of Jews killed in the holocaust; and (4) showed [p]laintiff a video of [Mack] firing an assault gun and hand guns.

Defendant retained outside counsel—the law firm of Dughi, Hewit & Domalewski, P.C. (special counsel)—to investigate plaintiff's and Mack's complaints. Two lawyers from the firm, both of whom are Caucasian, conducted the investigation. They reviewed documentation pertaining to the complaints and interviewed twelve witnesses.

---

[8] Plaintiff denied this fact and asserted he "told Santoro about Mack being a liar." To support this denial, plaintiff incomprehensibly cites to "Doc 738, 739." The record presented to the motion court does not permit an identification of the evidence to which the citation makes reference, and therefore does not allow a determination as to whether whatever plaintiff intended to rely on to support the denial constitutes competent evidence and, if so, whether it actually supports the denial.

12

One of those witnesses was Mack, who reported plaintiff:

> (a) intimated in front of Mack's co-workers that Mack engaged in homosexual activities at parties when he was younger by stating that "Dingo was fucking you in the ass" sometime between mid-January and mid-February of 2015[;]
>
> (b) asked employees in the company lunchroom "why is everything black dirty and bad, and pure things are white? White clouds, black crows" sometime between mid-January and mid-February of 2015[; and]
>
> (c) commented "Muslims like to blow people up and Catholics like to fuck little boys. Mack is home fucking his kids" in February 2015.

Mack also testified at his deposition that he had heard other employees using inappropriate language while at work, including "the n-word" and the word "faggot."

> Special counsel also interviewed Hamilton, who stated plaintiff:
>
> (a) came into the company lunchroom and questioned why black people commit more crimes than white people[;]
>
> (b) commented in the company lunchroom that Mack was the type of person who would molest his own children[;]
>
> (c) stated that "Muslims like to make bombs, Catholics like to mess with little boys, and Latinos are into Santeria"[; and]

13

(d) made comments to [Hamilton] about his Muslim faith over a period of years, including that Hamilton is Al Qaeda and likes to make bombs.

Special counsel also interviewed Cherry, who advised "he ha[d] heard comments about [p]laintiff being racist and having a terrible workplace demeanor and that he ha[d] heard some Latino workers complain about [p]laintiff being racist." Both Cherry and Santoro also reported "that during the interview of a new hire in February 2015, [p]laintiff continued to say 'andale, andale' when the candidate did not provide answers fast enough[,] and at one point [plaintiff] said, 'Welcome to America.'"

"Kim Ward, [defendant]'s Human Resources Benefits Administrator, told [s]pecial [c]ounsel that she [also] witnessed [p]laintiff say 'andale, andale,' and '[w]elcome to America' to job candidates during interviews[;] . . . that both candidates spoke English[;] and [that] one told [p]laintiff that he was born in America." "Ward [additionally] told [s]pecial [c]ounsel . . . [p]laintiff commented 'andale, andale, comprende' to another Hispanic job candidate and that Santoro told [p]laintiff . . . his comments were inappropriate on both occasions." Torres further corroborated this allegation, informing special counsel "that [p]laintiff made comments to Hispanic employees such as[,] 'Welcome to America[,]' and directed Spanish curse words at Hispanic

14

employees such as 'mamabicho' and 'cabron,' which [s]pecial [c]ounsel learned mean[t] 'you fucking cocksucker' and 'asshole-fucker-bitch.'"

"Hassan Hameen, an [a]ssistant [m]anager in the SID[D], told [s]pecial [c]ounsel that [p]laintiff 'doesn't know when to shut up' and likes to put fear in people"; "that [p]laintiff ha[d] called . . . employees 'gay'"; and that plaintiff "once referred to an employee's wife as a 'bitch.'"  "Jose Caban, a General Maintenance [s]upervisor, told [s]pecial [c]ounsel that he witnessed [p]laintiff make inappropriate comments and use foul language."  However, Caban "could not recall any specific examples."

"Kelvin Speights, a General Maintenance seasonal employee," informed special counsel "that [p]laintiff cursed and made racial slurs and inappropriate comments for the entire six years he worked in the SID[D]," which resulted in some "employees pass[ing] up opportunities to earn extra money working for [p]laintiff because of how [he] talk[ed] to people, including calling them dumb and stupid."  Speights further advised that "[p]laintiff [would] walk into a room where everyone [was] Spanish, looking to start with everyone[,] and would comment about one racial group to another racial group."  Speights provided as an example "that [p]laintiff [once] commented 'Spanish workers work hard but blacks are lazy; [forty] acres and a mule.'"  "Speights [also] told [s]pecial

15

[c]ounsel that [p]laintiff made a comment to him approximately three years prior about not wanting black people to move to his neighborhood because of black music and [barbecues] and stated that he has a shotgun if someone decides to come through and get into his house." Additionally, "Mark Sharpe, a General Maintenance employee, told [s]pecial [c]ounsel that [p]laintiff referred to him as 'Crackie' and accused [him] of 'messing with the stuff' after [his] drug test reported a false positive."

"Wilson Colon, a General Maintenance [s]upervisor, told [s]pecial [c]ounsel . . . he did not witness any inappropriate comments or conduct by [p]laintiff." However, Colon had only been employed in the SIDD since January 2015, two months before plaintiff's termination.

Special counsel also interviewed plaintiff, who said Mack made the comments alleged in plaintiff's counsel's March 17 letter during one conversation. However, Mack denied making the statements, and "Santoro, Cherry, Hameen, Torres, Hamilton, Caban, Colon, Speights[,] and Sharpe . . . all denied knowledge of Mack engaging in any such conduct." "Special [c]ounsel concluded that '[plaintiff]'s allegations against Mack [were] uncorroborated and not credible' and that '[t]here [was] no evidence that Mack violated [defendant]'s rules and policies.'"

A-5368-18

Based on the investigation, "[s]pecial [c]ounsel concluded . . . [p]laintiff 'consistently subjected his subordinates to inappropriate and racially or religiously charged comments in the workplace that would likely constitute more than random incidents and disagreements'"; "[p]laintiff 'initiated and carried on conversations regarding religious and racial stereotypes'"; and "[p]laintiff's 'behavior ha[d] been ongoing for some time and ha[d] only increased due to his recent promotion to General Manager.'" "Special counsel further concluded . . . '[t]he evidence against [plaintiff] support[ed] a pervasive pattern of disparaging, inappropriate[,] and offensive comments made by [plaintiff] in the workplace in the reported comments made to and about Mack, in additional comments made to and about other SID[D] employees, and in additional comments made to and about candidates during interviews.'"

Special counsel submitted a final report, and, on May 22, 2015, defendant terminated plaintiff's employment based upon Santoro's recommendation and Weiss and Palmieri's approval. Defendant notified plaintiff of his termination by letter that same day. The full records of special counsel's investigation and report were provided to plaintiff in discovery.

In opposition to defendant's summary judgment motion, plaintiff submitted a certification of William Scull, a private investigator, that plaintiff

17

identifies in his appendix on appeal as his "statement of facts." The certification makes no mention of it constituting a supplement to plaintiff's statement of material facts and, more importantly, it includes no citations to the record. See R. 4:46-2(a) to (b). Further, and as the motion court noted, the certification sets forth only assertions pertaining to the experience and beliefs of Holly Rosado, a Caucasian female who was employed by defendant. Since Scull—not Rosado—made the certification, it is not based on the personal knowledge of the affiant. See R. 1:6-6 ("If a motion is based on facts not appearing of record or not judicially noticeable, the court may hear it on affidavits made on personal knowledge . . . ."); see also Wells Fargo Bank, N.A. v. Ford, 418 N.J. Super. 592, 599 (App. Div. 2011) (stating "[a] certification will support the grant [or denial] of summary judgment only if the material facts alleged therein are based, as required by Rule 1:6-6, on 'personal knowledge'").

Plaintiff also relied on an unsworn email from Scull attaching an unsworn email from Rosado in which Rosado purportedly states the information provided in Scull's certification was accurate. Plaintiff additionally relied on a separate unsworn email from Scull to plaintiff's counsel attaching a purported email from Rosado stating she reviewed a certification from Scull, which is not attached to

either of the emails, and she "would testify, under the penalty of perjury, that [the] statements [in the certification] are accurate as documented."

The record shows the emails were submitted by plaintiff's counsel in a letter updating the court on the status of the matter. That is, the emails were submitted as an attachment to counsel's letter, and they are untethered to an affidavit based on personal knowledge establishing their authenticity. See R. 1:6-6; see also New Century Fin. Servs., Inc. v. Oughla, 437 N.J. Super. 299, 332 (App. Div. 2014) (providing that "[d]ocuments appended to [papers submitted to the trial court,] . . . not authenticated in a certification[,] must be rejected"); Ford, 418 N.J. Super. at 600 (finding "[t]he trial court should not have considered [a] document" which was "simply attached" to papers submitted to the court and not "authenticated by an affidavit or certification based on personal knowledge"); Celino v. Gen. Accident Ins., 211 N.J. Super. 538, 544 (App. Div. 1986) (explaining the requirement that "critical documents" which are purported to support facts upon which a motion for, or in opposition to, summary judgment is based must be submitted "to the court by way of affidavit or testimony" is "not merely formal," but "go[es] to the heart of procedural due process"). Moreover, none of the statements of purported fact set forth in the emails is supported by an affidavit based on personal knowledge as required by

Rule 1:6-6. Rosado never provided an affidavit in accordance with Rule 1:6-6 and Rule 1:4-4 supporting the assertions of fact attributed to her by Scull in his certification, and, for the reasons noted, the purported emails from Rosado upon which plaintiff relies to support the veracity of Scull's representations concerning Rosado do not constitute competent evidence.

Based on Scull's certification, plaintiff alleged "[Kincade] and [defendant] created an atmosphere that favored the majority African American and Muslim employees over Caucasians"; "[Kincade] and [defendant] reject[ed] qualified Caucasian job applicants for less[-]qualified African American applicants"; and "[a]fter passing over Caucasian job applicants, . . . [Kincade] and [defendant] would then request . . . the Caucasian job applicants to train the African American applicant[s] who undeservedly get the job or promotion." Plaintiff further alleged, based on Scull's certification, that "[f]rom 2005 to 2017, . . . [defendant] would systematically either fail to hire or fail to promote Caucasian applicants for positions due to race with the positions being filled by African American candidates instead"; "[Kincade] would discriminate and openly disparage Caucasian employees"; and, as a result, defendant "has become a government entity . . . that is comprised of [ninety-five percent] African American and Hispanic employees."

20

Although the court correctly noted "the certification [was] arguably not properly before the [c]ourt," it "nevertheless . . . assume[d] the allegations [were] before the [c]ourt." We decline to do the same. "[C]ertification[s] will support the grant [or denial] of summary judgment only if the material facts alleged therein are based, as required by Rule 1:6-6, on 'personal knowledge.'" Ford, 418 N.J. Super. at 599 (emphasis added). "[T]he trial court should not have considered [purported facts] that [were] not 'authenticated by an affidavit or certification based on personal knowledge,'" Deutsche Bank Nat'l Tr. Co. v. Mitchell, 422 N.J. Super. 214, 225 (App. Div. 2011) (quoting Ford, 418 N.J. Super. at 600), and we will not do so as part of our de novo review of the record on appeal.

The Court's Decision

After hearing argument on the cross-motions, the court rendered an opinion from the bench, finding plaintiff did not present evidence establishing a prima facie case of reverse race discrimination. The court explained plaintiff did not "raise an issue of material fact . . . demonstrat[ing] . . . [he] was targeted and ultimately terminated because he was [w]hite," or that defendant was the "unusual employer" who discriminates against the majority. The court likewise found plaintiff did not establish a prima facie case of retaliation because he did

not demonstrate a "causal link between the complaint" he made concerning Mack "and [his] termination." The court entered a June 27, 2019 order granting defendant summary judgment, dismissing plaintiff's claims, and denying plaintiff's cross-motion for summary judgment, and a June 28, 2019 order denying plaintiff's motion to extend discovery.

On appeal, plaintiff argues he presented sufficient evidence establishing: (1) defendant is the "unusual employer" who discriminates against the majority; (2) plaintiff was terminated due to his race and replaced with a less-qualified African American employee; and (3) there is a causal link between his complaint concerning Mack and his termination. Plaintiff also contends the trial court erred by denying his request for discovery of special counsel's itemized billing records related to the investigation that preceded his termination based on the attorney-client privilege.[9] We are not persuaded.

---

[9] Plaintiff's notice of appeal reflects an appeal only from the trial court's June 27, 2019 order granting defendant summary judgment. His notice of appeal does not identify the June 28, 2019 order denying his motion to extend discovery as one from which his appeal is taken. The order is thus not subject to our review. See Nielsen v. Wal-Mart Store No. 2171, 429 N.J. Super. 251, 256 n.3 (App. Div. 2013) (stating an order is "not preserve[d] . . . for review" when it is "not identif[ied] . . . in [the] notice of appeal"); see also 1266 Apt. Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004) ("[I]t is only the judgment or orders designated in the notice of appeal which are subject to the appeal process and review."). Plaintiff also waived any challenge to the order

## II.

Plaintiff first argues the court erred by granting defendant summary judgment on his reverse race discrimination claim. Under the LAD, it is unlawful "[f]or an employer, because of the race . . . of any individual, . . . to discriminate against such individual in compensation or in terms, conditions[,] or privileges of employment." N.J.S.A. 10:5-12(a). "In LAD cases, we 'frequently look to federal precedent . . . as "a key source of interpretive authority,"' unless 'that law sharply diverges from prior authority construing the LAD [or does not] further[] the objectives of the LAD [or] comport[] with our prior holdings.'" Crisitello v. St. Theresa Sch., 465 N.J. Super. 223, 228 n.2 (App. Div. 2020) (second, third, fourth, and fifth alterations in original) (quoting Aguas v. State, 220 N.J. 494, 510 n.4 (2015)); see also Turner v. Wong, 363 N.J. Super. 186, 210 (App. Div. 2003) (finding "[i]n interpreting the LAD, the federal law has consistently been considered for guidance").

In our assessment of disparate treatment claims under the LAD, we "conform[] our analysis in substantial measure to the burden-shifting framework

---

because he does not argue on appeal the court erred by denying his motion to extend discovery. See Sklodowsky, 417 N.J. Super. at 657; Jefferson Loan Co., 397 N.J. Super. at 525 n.4.

enunciated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)."[10] <u>Gerety</u>, 184 N.J. at 399. Under this approach, a plaintiff must first establish a prima facie case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. A plaintiff accomplishes this by demonstrating: "that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified [or less-qualified] person." <u>Gerety</u>, 184 N.J. at 399. "The burden then shifts to the employer to prove a legitimate, non-discriminatory reason for the employment action." <u>Ibid.</u> A "[p]laintiff can respond by showing the employer's proffered reason was merely pretext for the discrimination." <u>Ibid.</u> "Although the discrimination must be intentional," a plaintiff can prove discriminatory

---

[10] "The [U.S.] Supreme Court has recognized two theories of relief under Title VII—disparate treatment and disparate impact—and we acknowledge both as cognizable under the LAD." <u>Gerety v. Atl. City Hilton Casino Resort</u>, 184 N.J. 391, 398 (2005). Disparate impact claims "involve[] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another," whereas disparate treatment claims arise when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." <u>Ibid.</u> (quoting <u>Peper v. Princeton Univ. Bd. of Trs.</u>, 77 N.J. 55, 81-82 (1978)). Here, plaintiff alleges he suffered from disparate treatment; he claims he was terminated because of his race.

intent through "either direct or circumstantial evidence."  Bergen Com. Bank v. Sisler, 157 N.J. 188, 208 (1999).

"In reverse discrimination cases"—where the plaintiff is a member of a group "that has not historically been victimized by discrimination"—the first prong of the McDonnell Douglas framework requires the plaintiff to "substantiate . . . that the 'background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" Erickson v. Marsh & McLennan Co., 117 N.J. 539, 551-52 (1990) (citation omitted).

"An employee can demonstrate 'background circumstances' sufficient to raise an inference of discrimination" in one of two ways.  Bergen Com. Bank, 157 N.J. at 214 (quoting Murphy v. Milwaukee Area Tech. Coll., 976 F. Supp. 1212, 1217 (E.D. Wis. 1997)).  The first is "by establishing . . . that the plaintiff was better qualified for the position than the minority candidate selected."  Ibid. "A rational employer can be expected to promote the more[-]qualified applicant over the less[-]qualified, because it is in the employer's best interest to do so." Harding v. Gray, 9 F.3d 150, 153 (D.C. Cir. 1993).  "When an employer acts contrary to its best interests, then it is proper to infer a discriminatory motive." DeCapua v. Bell Atl.-N.J., Inc., 313 N.J. Super. 110, 122 (Law Div. 1998).  "As

the Supreme Court has observed, 'we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.'" Ibid. (quoting Harding, 9 F.3d at 154). Thus, "'[a]bsent a legitimate reason for the employer's action,' irrational conduct by an employer raises an inference of discrimination against the majority . . . employee." Ibid. (quoting Harding, 9 F.3d at 154). Alternatively, the plaintiff may demonstrate "that the defendant had some reason or inclination to discriminate against the majority class." Bergen Com. Bank, 157 N.J. at 214.

Plaintiff argues the court erred by finding he failed to establish a prima facie case of reverse race discrimination. In support of his argument, he cites to purported evidence he claims satisfies his burden of demonstrating a prima facie case. For example, plaintiff argues in conclusory fashion that "the incident causing his suspension and subsequent termination was either orchestrated . . . or appropriated . . . by [Kincade] . . . to replace plaintiff in his position with a less[-]qualified individual." We reject the argument because "'conclusory and self-serving assertions' . . . without explanatory or supporting facts will not defeat a meritorious motion for summary judgment." Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 425-26 (App. Div. 2009) (quoting Puder v. Buechel, 183 N.J. 428, 440 (2005)). Plaintiff's argument also fails

because it is untethered to any facts supported by citations to competent evidence that were presented to the court in the parties' Rule 4:46-2 statements.

Plaintiff similarly attempts to support his claim that "defendant is the unusual employer who discriminates against the majority," Erickson, 117 N.J. at 551 (citation omitted), by citing to special counsel's investigative report which states "Santoro . . . described the SID[D] as being 'approximately 95% minority, which he estimated at 50% [African American], 45% Hispanic[,] and 5% white/other.'" Plaintiff correctly asserts "statistical evidence may be useful in determining whether an act of discrimination has occurred," see Kunda v. Muhlenberg Coll., 621 F.2d 532, 542 (3d Cir. 1980) (stating "statistics as to [an employer's] employment policy and practice may be helpful to a determination of whether [the employer's action] . . . in [a given] case conform[s] to a general pattern of discrimination" (quoting McDonnell Douglas, 411 U.S. at 805)), and that a claim of discrimination in hiring by an African American applicant "would be bolstered by evidence that the selection rate of qualified [African American] applicants is significantly below the selection rate of qualified applicants of other races, or that [African Americans] are significantly under-represented in the employer's workplace given their availability in the qualified labor market," see Shea v. Kerry, 961 F. Supp. 2d 17, 28 (D.D.C. 2013) ("Statistically

significant disparities between the percentage of minorities employed and the percentage of qualified minorities in the labor market can be strong evidence of a manifest imbalance.").  We reject plaintiff's reliance on Santoro's purported statement, however, because it is not set forth in an affidavit as required by Rule 1:6-6; plaintiff did not rely on Santoro's purported statement in his opposition to the summary judgment before the motion court; and plaintiff did not present the purported facts described in Santoro's statement to the motion court in accordance with Rule 4:46-2.  Additionally, we otherwise do not consider plaintiff's argument based on Santoro's purported statement because it was "not properly presented to the trial court," Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973), and it does not "go to the jurisdiction of the trial court or concern matters of great public interest,"[11] ibid. (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)).

---

[11] In any event, we note that even assuming the statistical information was properly presented to the motion court, plaintiff provides no evidence or law supporting a conclusion or inference that defendant's "selection rate of qualified applicants of other races" is higher than that of Caucasians, or that Caucasians "are significantly under-represented in [defendant]'s workplace given their availability in the qualified labor market."  See Shea, 961 F. Supp. 2d at 28.  The statistical information attributed to Santoro in the investigate report merely describes the racial and ethnic composition of the SIDD workforce.  Thus, even if plaintiff properly included the information attributed to Santoro in his Rule 4:46-2 statement, it does not give rise to an inference of discrimination.  C.f.

Plaintiff also argues he established the first prong of a prima facie case of reverse race discrimination because he was "[r]eplaced . . . [w]ith [a l]ess[-q]ualified African[] American."  See Bergen Com. Bank, 157 N.J. at 214; Harding, 9 F.3d at 153-54.  Plaintiff claims "[t]he fact that he was promoted over his successor, . . . Cherry, who had to be trained for the position by another more[-]qualified Caucasian candidate[, Rosado,] who incidentally was passed over for the position, certainly supports an inference that . . . plaintiff was better qualified."

Plaintiff also suggests Cherry's promotion over the purportedly "more[-]qualified" Rosado further establishes the required "background circumstances." See Erickson, 117 N.J. at 551 (citation omitted).  Again, plaintiff's Rule 4:46-2 statement does not present any facts demonstrating Cherry's qualifications, or lack of them, or supporting a finding Cherry was less qualified than plaintiff. Further, and more importantly, plaintiff's reliance on the "less-qualified minority applicant" standard is misplaced.  See Harding, 9 F.3d at 153-54.  The standard assumes employers are rational, and therefore, when an employer acts

_____

Shea, 961 F. Supp. 2d at 28 (explaining "[s]tatistically significant disparities between the percentage of minorities employed and the percentage of qualified minorities in the labor market can be strong evidence of a manifest imbalance" (emphasis added)).

against its best interest in hiring or promoting a less-qualified minority employee over a more-qualified member of the majority without "a legitimate reason," discrimination is the only plausible motive. DeCapua, 313 N.J. Super. at 122 (quoting Harding, 9 F.3d at 154).

Here, the undisputed facts in the parties' Rule 4:46-2 statements establish defendant had "a legitimate reason" to terminate plaintiff. Ibid. (quoting Harding, 9 F.3d at 154). After conducting interviews of twelve employees, special counsel concluded plaintiff "consistently subjected his subordinates to inappropriate and racially or religiously charged comments in the workplace," and his "behavior ha[d] been ongoing for some time and ha[d] only increased [after] his . . . promotion to General Manager." Plaintiff does not dispute that such conduct violates defendant's anti-harassment and anti-discrimination policy, which plaintiff describes as "zero[-]tolerance."[12] Thus, even if plaintiff was more qualified for the position than Cherry—and plaintiff presented no competent evidence that is the case—defendant's decision to replace plaintiff does not give rise to an inference of discrimination because the termination of

---

[12] The parties' Rule 4:46-2 statements do not specifically address the contents of defendant's anti-harassment and anti-discrimination policy. However, the allegations against plaintiff, if true, clearly constitute harassment and/or discrimination.

plaintiff's employment necessitated defendant filling the position with another person. DeCapua, 313 N.J. Super. at 122; Harding, 9 F.3d at 153-54.

Plaintiff also claims Cherry was less qualified than Rosado for plaintiff's position, but that assertion finds no support in the summary judgment record. The information concerning Rosado that plaintiff presented in opposition to the summary judgment motion is supported solely by the Scull certification which, as noted, does not constitute competent evidence because it is not based on Scull's personal knowledge. See R. 1:6-6. Thus, the record lacks any competent evidence that was properly presented to the court supporting plaintiff's claims concerning Rosado. See ibid.; Mitchell, 422 N.J. Super. at 225; Ford, 418 N.J. Super. at 600.

In support of his argument that the summary judgment record established a prima facie case of reverse race discrimination, plaintiff also generally relies on the following: (1) the "disparate treatment" of Rosado; (2) "the treatment afforded Dawn Messer," who plaintiff claims in his appellate brief "was transferred from . . . [Kincade]'s supervision following an incident . . . that left Ms. Messer visibly upset"; (3) defendant's failure to discipline Mack for showing a video of himself at a gun range to co-workers; and (4) the fact that plaintiff was punished for using offensive language while others in the SIDD

31

were not. These broad claims find no support in the parties' Rule 4:46-2 statements.

As noted, the information concerning Rosado is not supported by competent evidence.[13] Similarly, the parties' Rule 4:46-2 statements do not include any facts pertaining to Messer, and, as a result, the record is devoid of competent evidence supporting plaintiff's claims concerning her. See Kenney, 308 N.J. Super. at 573.

---

[13] We also observe that even if we could properly accept as true the information concerning Rosado that Scull provides in his certification, it does not provide facts supporting a finding Rosado was the victim of the disparate treatment form of reverse race discrimination. The certification details certain employment actions taken at the SIDD that Rosado allegedly reported to Scull. The certification reports little more than Rosado believed that the actions about which she was dissatisfied were taken because of her race—Caucasian. For example, the certification states Rosado was not appointed to several positions during her tenure at SIDD, and that she "believes" she was rejected because of her race. The certification similarly includes conclusory assertions, untethered to any reported statements of fact, that the positions for which she applied were awarded to less-qualified and less-experienced African American employees. The certification, however, does not include a report of any facts supporting the claim she was the more-qualified candidate or permitting the court to conclude she was. In other words, the certification is devoid of any reported facts allegedly made by Rosado that support either a finding or a reasonable inference that defendant is the unusual employer who discriminates against the majority. The certification also does not identify any African American employees similarly situated to plaintiff; the certification does not identify an African American employee who, like plaintiff, engaged in conduct violative of the anti-harassment and anti-discrimination policy, and who was not terminated.

We also consider plaintiff's claim defendant's disparate treatment in punishment of its employees for "misconduct of comparable seriousness" gives rise to an inference defendant is an unusual employer who discriminates against the majority. He argues "that witnesses had heard offensive words[,] like '[the n-word]' . . . and 'faggot,' for years, but . . . no one was ever reprimanded for it, despite a known . . . zero[-]tolerance policy that was stated in every handbook every employee at the SID[D] was required to acknowledge receiving." Defendant's failure to take action in response to the use of offensive terms by other employees does not support an inference of discrimination because the undisputed facts show, and plaintiff acknowledges, "no one ever reported" the other employees' offensive behavior. It cannot reasonably be concluded that defendant enforced its "zero[-]tolerance policy" in a discriminatory manner by imposing discipline for misconduct about which it had knowledge but failing to impose discipline for misconduct about which it is undisputed defendant was unaware.

We next address plaintiff's claim defendant's failure to punish Mack for showing co-workers a video of himself at a gun range establishes racially disparate punishment for infractions of similar seriousness. Plaintiff vaguely claims, "In this era of reported mass shootings in the workplace, it is

33                                                                    A-5368-18

inconceivable that this kind of inappropriate behavior wouldn't at least merit a reprimand in the file."  However, he does not allege Mack made any threats while showing the video, or that Mack violated any laws or any of defendant's policies.  In contrast, plaintiff's conduct, as reported by special counsel following its investigation, constituted a blatant violation of defendant's anti-discrimination and anti-harassment policy.

In sum, the undisputed facts do not establish defendant terminated plaintiff and hired a less-qualified employee without "a legitimate reason." DeCapua, 313 N.J. Super. at 122 (quoting Harding, 9 F.3d at 154).  Further, plaintiff failed to present any competent evidence establishing "defendant had some reason or inclination to discriminate against the majority class."  Bergen Com. Bank, 157 N.J. at 214.  Because plaintiff did not "substantiate . . . that the 'background circumstances support the suspicion that . . . defendant is the unusual employer who discriminates against the majority,'" Erickson, 117 N.J. at 551 (citation omitted); see also Bergen Com. Bank, 157 N.J. at 214, the court correctly determined he failed to satisfy the first prong of a prima facie claim of discrimination, see Erickson, 117 N.J. at 551.  For that reason alone, we affirm the court's summary judgment award to defendant on plaintiff's reverse race discrimination claim.

Although unnecessary to our affirmance of the court's order granting defendant summary judgment on the reverse race discrimination claim, we briefly address the court's analysis of the second prong of a prima facie case of race discrimination.

To satisfy the second prong of a prima facie discrimination claim, a plaintiff must show he or she was "objectively qualified" for his or her position. Gerety, 184 N.J. at 399. The plaintiff's burden is slight: "[a]ll that is necessary is that the plaintiff produce evidence showing that [he or] she was actually performing the job prior to the termination." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 454 (2005). Furthermore, "only the plaintiff's evidence should be considered." Id. at 455. "That evidence can come from records documenting the plaintiff's longevity in the position at issue or from testimony from the plaintiff or others that [he or] she had, in fact, been working within the title from which [he or] she was terminated." Ibid. Facts that are "more properly debated in the second and third stages of the burden-shifting test," such as issues with the plaintiff's performance, "do not come into play as part of the second prong of the prima facie case." Ibid.

Here, the court found defendant did not satisfy the second prong because it did "not believe . . . plaintiff [could] establish . . . [he] was performing his job

35

in a manner that met the employer's legitimate expectations" and "the investigation conducted by [special] counsel [uncovered] that . . . plaintiff made racist, religiously intolerant[,] and other derogatory comments to employees." However, the alleged deficiencies in plaintiff's performance should not have been considered in assessing the second prong. See ibid. In Zive, our Supreme Court explained that language in prior cases defining the "legitimate expectations" test was "at best imprecise and at worst, misleading," id. at 450, 454, and, as noted, held that a plaintiff satisfies the second prong by establishing he or she was "performing the job prior to the termination," id. at 454-55. There is no dispute plaintiff was "working within the title from which []he was terminated" at the time of his termination. Id. at 455. As such, plaintiff's alleged misconduct in making inappropriate statements to co-workers did not support the court's finding plaintiff failed to satisfy the second prong of the prima facie standard. See id. at 454-55. However, since plaintiff otherwise failed to present evidence establishing the first prong of a prima facie case, the court's error is of no moment.[14]

---

[14] The court did not expressly address the issue of "pretext" in the context of its decision granting defendant summary judgment on plaintiff's reverse race discrimination claim. See Gerety, 184 N.J. at 399. Instead, it mentioned pretext only in its discussion of plaintiff's cross motion for summary judgment, noting

III.

Plaintiff next argues the court erred by "[d]enying [p]laintiff [d]iscovery of" special counsel's itemized billing records based on attorney-client privilege. "In general, we apply an abuse of discretion standard to decisions made by our trial courts relating to matters of discovery." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011). "That is, '[w]e generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law.'" Ibid. (alteration in original) (quoting Rivers v. LSC P'ship, 378 N.J. Super. 68,

---

plaintiff "moved for summary judgment[,] . . . arguing that [defendant]'s finding that plaintiff created a hostile work environment was a pretext and the real reason was discrimination and therefore plaintiff should be granted a motion for summary judgment," and that "[p]laintiff devote[d] one short paragraph to this argument." The court found it was "not . . . clear what . . . theory of plaintiff's complaint . . . plaintiff [was] seeking . . . summary judgment on," but the court concluded "there [was] no merit to [plaintiff's] argument" and it denied plaintiff's cross motion. Although we review the summary judgment record de novo, we do not determine if defendant is also entitled to summary judgment on the reverse race discrimination claim based on plaintiff's failure to establish defendant's legitimate nondiscriminatory reason for the termination was a pretext for race discrimination, because the issue was not decided by the motion court and resolution of the issue is unnecessary to our disposition of the arguments presented on appeal. See Estate of Doerfler v. Fed. Ins., 454 N.J. Super. 298, 301-02 (App. Div. 2018) (explaining our de novo review of a summary judgment record does not require that we decide pertinent issues in the first instance). We also note plaintiff does not challenge on appeal the court's denial of his cross-motion. See Sklodowsky, 417 N.J. Super. at 657; Jefferson Loan Co., 397 N.J. Super. at 525 n.4.

80 (App. Div. 2005)).  "An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  Kornbleuth v. Westover, 241 N.J. 289, 302 (2020) (quoting Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2014)).

Plaintiff does not explain how the trial court "[d]en[ied him d]iscovery of" the itemized billing records.  Plaintiff never moved to compel production of the billing records, and, as noted, he does not appeal from the court's June 28, 2019 order denying his motion to extend discovery.  See Nielsen, 429 N.J. Super. at 256 n.3 (finding an order is "not preserve[d] . . . for review" when it is "not identif[ied] . . . in [the] notice of appeal").  We therefore interpret plaintiff's argument to be that the court erred by granting defendant summary judgment prior to plaintiff's receipt of the billing records he had requested.

Although the court found special counsel's itemized bills were protected by the attorney-client privilege, the court more significantly concluded production of the records would not impact its determination of defendant's summary judgement motion.  The court explained defendant had "produced nearly 900 pages of documents[,] . . . including [its] entire investigation file," and, based on its in camera review of the itemized bills, the court determined

the billing records were "not germane to the issues in this case." More particularly, the court found the records did "not disclose anything that would suggest . . . this was some type of sham investigation as alleged by . . . plaintiff," nor did they suggest "that the attorney investigators were somehow directed to focus on certain evidence to the exclusion of other evidence or to come to some particular conclusion."

Plaintiff argued before the motion court, and argues again on appeal, he is entitled to the billing records because they will reveal whether special counsel conducted LAD research and they will demonstrate that special counsel's investigation was a sham. We reject the contention because he offers no basis in law or logic to reverse the court's determination that whether special counsel performed LAD research is simply not relevant to whether plaintiff could establish a prima facie case of reverse race discrimination or any of his other claims against defendant. Moreover, the court's independent review of the billing records disclosed that they did not establish any facts supporting plaintiff's claims of discriminatory or retaliatory treatment or that the investigation was a sham. Plaintiff provides no basis supporting a reversal of the court's findings, and we discern no grounds to conclude the court erred by deciding the summary judgment motion without providing plaintiff access to the

A-5368-18

records.  See Minoia v. Kushner, 365 N.J. Super. 304, 307 (App. Div. 2004) (finding disposition of a summary judgment motion should not be delayed to permit additional discovery where the discovery "will patently not change the outcome" of the court's ruling on the motion); United Sav. Bank v. State, 360 N.J. Super 520, 525 (App. Div. 2003) (explaining "if further factual development is unnecessary in light of the issues presented, then summary judgment need not be delayed" to permit additional discovery).

IV.

Last, we address plaintiff's contention the court erred by granting defendant summary judgment dismissing his retaliation claim.  Under the LAD, it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has sought legal advice regarding rights under this act . . . or filed a complaint."  N.J.S.A. 10:5-12(d).  To establish an LAD retaliation claim, plaintiffs must show: "(1) they engaged in a protected activity known by the employer; (2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation."  Craig v. Suburban Cablevision, 140 N.J. 623, 629-30 (1995).

The third prong—causation between the protected activity and adverse action—"may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive," and evidence which may establish pretext for termination may also serve that function. Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550-52 (App. Div. 1995). Temporal proximity of protected activity and an adverse employment action will not, by itself, support an inference of causation unless "the facts of the particular case are so 'unusually suggestive of retaliatory motive.'" Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).

Plaintiff failed to present evidence to the motion court establishing a causal link between his counsel's March 17, 2015 letter complaint concerning Mack and his termination. The undisputed facts establish defendant suspended plaintiff, and advised plaintiff it would perform an investigation concerning the conduct which ultimately led to his termination, prior to his counsel's March 17 letter. On March 12, 2015, Santoro gave plaintiff an "[e]mployee [w]arning [n]otice" stating plaintiff was suspended "pending [the] outcome of [an] investigation." Special counsel conducted the investigation and provided a comprehensive report to defendant on May 15, 2015, stating plaintiff

41

"consistently subjected his subordinates to inappropriate and racially or religiously charged comments." Defendant then terminated plaintiff's employment on May 22. Plaintiff presented no evidence or facts to the motion court, nor points to any on appeal, supporting an inference defendant's decision to terminate plaintiff was due to plaintiff's complaint, and the undisputed facts in the summary judgment record establish plaintiff was terminated because special counsel's investigation revealed plaintiff's consistent violation of what he admits is defendant's "zero[-]tolerance" anti-discrimination and anti-harassment policy.

Finally, plaintiff argues defendant had a pre-determined plan to fire him prior to the investigation. This factual assertion alone requires the dismissal of plaintiff's retaliation claim because it is undisputed defendant decided to conduct the investigation prior to plaintiff's counsel's letter complaint. If, as plaintiff asserts, defendant resolved to terminate plaintiff prior to the investigation and service of plaintiff's complaint, then defendant did not, and could not have, decided to terminate plaintiff in retaliation for the complaint. In any event, and putting plaintiff's illogical arguments aside, we are convinced the court correctly determined plaintiff failed to present evidence establishing

42

causation and properly granted defendant summary judgment on plaintiff's retaliation claim.

To the extent we have not expressly addressed any of plaintiff's other arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5368-18